**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**July 23, 2008**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

## UNITED STATES COURT OF APPEALS

## TENTH CIRCUIT

KT&G CORP., XCALIBER
INTERNATIONAL LIMITED, LLC,

     Plaintiffs - Appellants,

v.

ATTORNEY GENERAL OF THE
STATE OF OKLAHOMA, W.A. Drew
Edmondson, in his official capacity as
Attorney General,

     Defendant - Appellee.

Nos. 05-5175, 05-5178

XCALIBER INTERNATIONAL
LIMITED, LLC,

     Plaintiff - Appellant,

v.

STEPHEN SIX, Attorney General, in
his official capacity as Attorney
General, State of Kansas,

     Defendant - Appellee.

No. 06-3061

**Appeal from the United States District Court**
**for the Northern District of Oklahoma**
**(D.C. No. 04-CV-922-EA)**

**Appeal from the United States District Court**
**for the District of Kansas**
**(D.C. No. 05-CV-2261-JWL)**

Leonard Violi, Law Offices of Leonard Violi, LLC, Mamaroneck, New York (David R. Cordell and Bruce W. Freeman, Conner & Williams, LLP, Tulsa, Oklahoma, with him on the briefs), for Plaintiff-Appellant KT&G Corp.

Kyle M. Keegan, Roy, Kiesel, Keegan & DeNicola, Baton Rouge, Louisiana (Chris D. Kiesel, Roy, Kiesel, Keegan & DeNicola, Baton Rouge, Louisiana, Bruce W. Freeman and David R. Cordell, Connor & Winters, Tulsa, Oklahoma, and William M. Modrein, Stinson Morrison Hecker LLP, Kansas City, Missouri, with him on the briefs) for Plaintiff-Appellant Xcaliber International Limited, LLC.

Gary D. Wilson, Washington, D.C. (Guy L. Hurst, Senior Assistant Attorney General, Oklahoma Attorney General's Office, Oklahoma City, Oklahoma and Mark Greenwold, Special Assistant Attorney General, State of Oklahoma, National Association of Attorneys General, Washington, D.C., with him on the briefs) for Defendant-Appellee W.A. Drew Edmondson, Attorney General, State of Oklahoma.

Gary D. Wilson, Washington, D.C. (Michael G. Hering and Peter J. Hering, National Association of Attorneys General, Washington, D.C., and Eliehue Brunson, Assistant Deputy Attorney General, Topeka, Kansas, with him on the brief) for Defendant-Appellee Stephen Six, Attorney General, State of Kansas.[1]

Before **O'BRIEN, EBEL** and **TYMKOVICH**, Circuit Judges.

---

[1]Pursuant to Fed. R. App. P. 43(c)(2), the current Kansas attorney general, Stephen Six, has been substituted for the former attorney general, Phill Kline. See Khader v. Aspin, 1 F.3d 968, 969 n.1 (10th Cir. 1993).

**EBEL**, Circuit Judge.

In 1998, forty-six states, as well as several territories ("the settling states"), entered into a Master Settlement Agreement ("MSA") with the four major tobacco companies. By that agreement, the settling states agreed to release the tobacco companies from liability for claims the states had against them to recover for tobacco-related health costs, and the tobacco companies in turn agreed to make annual payments to the states in perpetuity. Pursuant to the MSA, each of the settling states also enacted legislation that required tobacco manufacturers who sell cigarettes in a particular state and who have not joined the MSA ("non-participating manufacturers" or "NPMs"), to make annual payments to be held in an escrow fund for twenty-five years. These escrowed monies create a fund from which the state can later recover from an NPM, if the state sues that NPM to recover tobacco-related costs.

Kansas and Oklahoma, which were among the settling states, joined most of those states in amending the provisions of their escrow statutes that provided for refunds to NPMs of part of their annual escrow payment. The effect of this amendment, known as the Allocable Share Amendment, was to reduce the amount of escrow funds refunded to the NPMs each year.

In the cases underlying these appeals, two NPMs, Xcaliber International Limited LLC and KT&G Corp. ("Plaintiffs"), challenge Kansas's and Oklahoma's

Allocable Share Amendments, arguing those amendments violate the Sherman Act and are unconstitutional. Having jurisdiction to consider these appeals under 28 U.S.C. § 1291, we AFFIRM the district courts' decisions to dismiss Plaintiffs' claims.

## I. BACKGROUND

**A.    Master Settlement Agreement**

In November 1998, forty-six states, including Kansas and Oklahoma, as well as the District of Columbia, Puerto Rico, and the territorial governments of Guam, the Virgin Islands, American Samoa, and the Northern Marianas (collectively "the settling states"), entered into the MSA with the four major tobacco companies ("original participating manufacturers," or "OPMs").[2]  In that agreement, the settling states released past, pending, and future claims they had, or might have, against the OPMs seeking "recovery for Medicaid and other public health expenses incurred in the treatment of smoking-induced illnesses."  Robin Miller, supra, at 460.  In return, the OPMs agreed to restrict their advertising, sponsorship, lobbying, and litigation activities, particularly as those activities

---

[2]These four major tobacco companies are Brown and Williamson Tobacco Corporation, Lorillard Tobacco Company, Philip Morris, Incorporated, and R.J. Reynolds Tobacco Company.  Four states, Florida, Minnesota, Mississippi, and Texas, had previously entered into separate agreements to settle similar claims against these same companies.  See Robin Miller, Validity, Construction, Application, and Effect of Master Settlement Agreement (MSA) Between Tobacco Companies and Various States, and State Statutes Implementing Agreement; Use and Distribution of MSA Proceeds, 25 A.L.R. 6th 435, 461n.13 (2007).

targeted youth; to disband three specific "Tobacco-Related Organizations," and to restrict their creation and participation in trade associations; generally to make available to the public documents the OPMs had disclosed during the discovery phase of their litigation with the settling states; and to create and fund the National Public Education Foundation, dedicated to reducing youth smoking and preventing diseases associated with smoking.

Each OPM acknowledged that its decision to join the MSA was voluntary, and

> further acknowledge[d] that it understands that certain provisions of this Agreement may require it to act or refrain from acting in a manner that could otherwise give rise to state or federal constitutional challenges and that, by voluntarily consenting to this Agreement, it (and . . . any trade associations formed or controlled by any Participating Manufacturer)[] waives for purposes of performance of this Agreement any and all claims that the provisions of this Agreement violate the state or federal constitutions.

The OPMs further agreed to make annual payments to the settling states in perpetuity. The MSA sets forth specific amounts that the OPMs have agreed to pay the settling states each year. Those annual amounts are subject to a number of adjustments. The OPMs each pay a portion of the total annual payment according to each OPM's "Relative Market Share" for the preceding year.[3]

---

[3]The MSA specifically provides that

"Relative Market Share" means an [OPM's] respective share (expressed as a percentage) of the total number of individual Cigarettes shipped in or to the fifty United States, the District of Columbia and Puerto Rico

(continued...)

The OPMs pay these annual amounts to an escrow agent who disburses the payments among the settling states according to each state's "allocable share." The MSA's Exhibit A sets forth a specific value representing each state's allocable share. Kansas' allocable share is 0.8336712%, meaning each year Kansas receives approximately .83% of the total annual payments that the participating manufacturers make under the MSA. Similarly, Oklahoma, with an allocable share of 1.0361370%, receives just over one percent of the annual payments made by participating manufacturers. Each state's allocable share does not change from year to year, and thus the distribution of the annual payments according to each state's allocable share is "not dependent on sales volumes within" each state, Miller, supra, at 464. Rather, it represents a preset agreement among the settling states on how the MSA payments will be divided among them.

Cigarette manufacturers other than the OPMs can also join the MSA. Such

---

[3](...continued)
by all the [OPMs] during the calendar year immediately preceding the year in which the payment at issue is due (regardless of when such payment is made), as measured by the [OPMs'] reports of shipments of Cigarettes to Management Science Associates, Inc. (or a successor entity acceptable to both the [OPMs] and a majority of those Attorneys General who are both the Attorney General of a Settling State and a member of the NAAG [National Association of Attorneys General] executive committee at the time in question). A Cigarette shipped by more than one Participating Manufacturer shall be deemed to have been shipped solely by the first Participating Manufacturer to do so. For purposes of the definition and determination of "Relative Market Share," 0.09 ounces of "roll your own" tobacco constitutes one individual Cigarette.

a manufacturer is referred to as a subsequently participating manufacturer ("SPM"). To join, an SPM must agree to abide by the MSA's restrictions on advertising, marketing, lobbying, and litigation. In return, the settling states will release relevant claims that the states have, or might have, against that SPM. Approximately forty SPMs have now joined the MSA. See Miller, supra, at 462.

As an incentive to join the MSA, the agreement provides that, if an SPM joined within ninety days following the MSA's "Execution Date," that SPM is exempt ("exempt SPM") from making annual payments to the settling states unless the SPM increases its share of the national cigarette market beyond its 1998 market share, or beyond 125% of that SPM's 1997 market share. If the exempt SPM's market share in a given year increases beyond those relevant historic limits, the MSA requires that the exempt SPM make annual payments to the settling states, similar to those made by the OPMs, but based only upon the SPM's sales representing the exempt SPM's market share increase.

SPMs joining the MSA after this ninety-day exempt period must, instead, make annual payments based upon all of the SPM's national cigarette sales for a given year. In addition to its annual payment obligations, in order to join the MSA now, a non-exempt SPM must, "within a reasonable time after signing the" MSA, pay the amount it would have been obligated to pay under the MSA during the time between the MSA's effective date and the date on which the SPM joined the agreement.

Both exempt and non-exempt SPMs' annual payment obligations under the MSA are "calculated on the basis of the percentage of the four original participating manufacturers' total domestic market share represented by the SPM[s'] domestic market share . . . . In other words, the denominator in the calculation is the total OPM market share, not the total OPM and SPM market share." Miller, supra, at 465-66. Furthermore, the parties agree that the amount the SPMs pay per cigarette is roughly the same as the per-cigarette amount that the OPMs pay under the MSA. To the extent the amount differs, the OPMs pay slightly more than the SPMs on a per cigarette basis.

One of Xcaliber's primary complaints is that its direct competitors are the exempt SPMs which, like Xcaliber, sell cheaper discount brand cigarettes. As the MSA is designed, these exempt SPMs have a distinct pricing advantage as compared to all other cigarette manufacturers, including the OPMs, the non-exempt SPMs, and the NPMs. The exempt SPMs will not have to make any annual payments on cigarette sales in a given year until they exceed their protected market share. Xcaliber, as well as OPMs, non-exempt SPMs, and the other NPMs, on the other hand, will have to make annual payments calculated under the MSA for all of their cigarette sales during a given year, although the NPM payments will be in the nature of annual escrow payments, which they may be able to retrieve in twenty-five years.

Xcaliber further complains that, because it did not go into business until

8

2001, which was after the ninety-day period provided for an exempt SPM to join the MSA, Xcaliber never had the opportunity to join the MSA as an exempt SPM. (KT&G, on the other hand, was in business at the time the MSA was executed and so did have an opportunity to join as a non-exempt SPM, but chose not to do so.) XCaliber and KT&G can still join the MSA, but only as non-exempt SPMs who will have to make annual payments based upon all of their national cigarette sales. In addition, they would have to make back payments representing the amounts they would have had to pay under the MSA in the preceding years.

XCaliber and KT&G further contend that, even if they decided to join the MSA now, the manufacturers who are already participating in the MSA could veto Xcaliber's and KT&G's participation. The states, on the other hand, assert that the participating manufacturers do not hold any such veto power.

**B.     Escrow statutes**

The MSA includes a model escrow (or qualifying) act and provides strong incentives for settling states to adopt it. See Miller, supra, at 466-67. "[A] Qualifying Statute . . . is one that effectively and fully neutralizes the cost disadvantages that the Participating Manufacturers experience vis-a-vis Nonparticipating Manufacturers within the state." Id. at 467 (quotation omitted).

The MSA encouraged settling states to adopt the model escrow act by providing that a settling state's allocated payment—that is, the portion of the annual MSA payment that a particular state receives in a given year—could be

9

reduced by applying a non-participating manufacturers ("NPM") adjustment. That adjustment lowers a state's allocated share of the annual MSA payment if the OPMs lose market share to NPMs and if "a nationally recognized firm of economic consultants" determines that the MSA was "a significant factor contributing to the Market Share Loss for the year in question." The NPM adjustment does not apply to any state that has enacted and has in "full force and effect" a "qualifying" or model escrow statute. All settling states, including Kansas and Oklahoma, adopted the model escrow act. Kan. Stat. §§ 50-6a01 through 50-6a03; Okla. Stat. tit. 37, §§ 600.21 through 600.23, see Miller, supra, at 467.

The escrow statute is premised on the legislative finding that, in light of the MSA settling the states' claims against the major cigarette manufacturers,

> [i]t would be contrary to the policy of the State if tobacco product manufacturers who determine not to enter into such a settlement could use a resulting cost advantage to derive large, short-term profits in the years before liability may arise without ensuring that the State will have an eventual source of recovery from them if they are proven to have acted culpably. It is thus in the interest of the State to require that such manufacturers establish a reserve fund to guarantee a source of compensation and to prevent such manufacturers from deriving large, short-term profits and then becoming judgment-proof before liability may arise.

See Kan. Stat. § 50-6a01(f); Okla. Stat. tit. 37, § 600.21(D).

In light of that, the model escrow statute requires an NPM selling cigarettes in a given state to do one of two things: 1) join the MSA, agreeing to "become a

10

participating manufacturer (as that term is defined in section II(jj) of the [MSA]) and generally perform its financial obligations under the [MSA]," or 2) make similar annual payments into the state's escrow fund. See also Kan. Stat. § 50-6a03; Okla. Stat. tit. 37, § 600.23(A). An NPM's annual escrow payments in a particular state are calculated by multiplying a per-cigarette amount, established by the state's legislature and set forth in the statute, by the number of cigarettes the NPM sold in that state in the year for which payment is being made.[4] See also Kan. Stat. § 50-6a03(b)(1); Okla. Stat. tit. 37, § 600.23(A)(2). The parties agree that this per-cigarette amount is roughly equivalent to the per-cigarette amount the MSA requires from OPMs and SPMs for sales which are not exempt. To the

---

[4]The escrow statute specifically requires that the NPM

place into a qualified escrow fund by April 15 of the year following the year in question the following amounts (as such amounts are adjusted for inflation)--

   (A)  1999: $.0094241 per unit sold after the effective date of this act;

   (B)  2000: $.0104712 per unit sold;

   (C) for each of 2001 and 2002: $.0136125 per unit sold;

   (D)  for each of 2003 through 2006: $.0167539 per unit sold;

   (E)  for each of 2007 and each year thereafter: $.0188482 per unit sold.

Kan. Stat. § 50-6a03(b)(1); see also Okla. Stat. tit. 37, § 600.23(A)(2).

11

extent it differs, the OPMs pay slightly more than the SPMs, which pay slightly more than the NPMs.

> The NPMs' escrowed funds will be released only upon three occurrences:
>
> Such funds themselves shall be released from escrow only under the following circumstances—
>
> (A) to pay a judgment or settlement on any released claim brought against such tobacco product manufacturer by the State or any releasing party located or residing in the State.  Funds shall be released from escrow under this subparagraph (i) in the order in which they were placed into escrow and (ii) only to the extent and at the time necessary to make payments required under such judgment or settlement;
>
> (B) to the extent that a tobacco product manufacturer establishes that the amount it was required to place into escrow in a particular year was greater than the State's allocable share of the total payments that such manufacturer would have been required to make in that year under the [MSA] (as determined pursuant to section IX(i)(2) of the [MSA], and before any of the adjustments or offsets described in section IX(i)(3) of that Agreement other than the Inflation Adjustment) had it been a participating manufacturer, the excess shall be released from escrow and revert back to such tobacco product manufacturer; or
>
> (C) to the extent not released from escrow under subparagraphs (A) or (B) . . . funds shall be released from escrow and revert back to such tobacco product manufacturer twenty-five years after the date on which they were placed into escrow.

See also Kan. Stat. § 50-6a03(b)(2); Okla. Stat. tit. 37, 600.23(B).  The NPM earns interest on the funds it pays into the escrow fund.  See Kan. Stat. § 50-6a03(b)(2); Okla. Stat. tit. 37, § 600.23(B).

An NPM must annually certify to the state that it is in compliance with the escrow statute.  See Kan. Stat. § 50-6a03(b)(3); Okla. Stat. tit. 37, § 600.23(E)

12

(after amendment). The NPM faces civil penalties if it fails to make the required escrow payments. See Kan. Stat. § 50-6a03(b)(3); Okla. Stat. tit. 37, § 600.23(E) (after amendment).

## C. Allocable Share Amendment

The Allocable Share Amendment ("Amendment") at issue in these cases concerned the second manner in which escrowed funds can be released—refunding escrowed funds in excess of the amount an NPM would have had to pay under the MSA in a given year. The originally enacted escrow statutes permitted an NPM to obtain a refund of the amount the NPM paid into the escrow fund

> to the extent that a tobacco product manufacturer establishes that the amount it was required to place into escrow in a particular year was greater than the State's allocable share of the total payments that such manufacturer would have been required to make in that year under the [MSA] . . . had it been a participating manufacturer.

(Emphasis added.) See also Kan. Stat. § 50-6a03(b)(2)(B); Okla. Stat. tit. 37, § 600.23(B)(2).

The settling states agreed to divide the annual MSA payment among themselves according to each state's preset allocable share, rather than according to the volume of sales made in a particular state in a given year. See Miller, supra, at 464. An NPM's payments into a state's escrow fund, on the other hand, were dependent on the number of cigarettes that the NPM sold in that state in a given year. Nevertheless, the originally enacted escrow statute based any refund

13

of those escrowed funds payments on that state's allocable share of the national MSA payment. This refund provision, then, assumed an NPM would sell its cigarettes nationally. See id. at 469.

Rather than selling cigarettes nationally, however, several NPMs instead concentrated their sales in just a few states. See id. Because the originally enacted escrow statute refunded escrow funds to the extent those funds exceeded each state's "allocable share" of the national MSA payment, NPMs were able to obtain refunds of most of the monies they had paid into a state's escrow fund. To illustrate, if an NPM only sold cigarettes in Kansas in 2006, the Kansas escrow statute would require that NPM to pay into the Kansas escrow fund $.0167539 for each cigarette the NPM sold in that state. See Kan. Stat. § 50-6a03(b)(1)(D). Pursuant to the refund provision in the originally enacted Kansas escrow statute, however, the NPM could obtain a refund of all but .8336712% of those payments.

> One commentator further explains that the
>
> calculations under the [originally enacted escrow] statutes were based on an assumption that a nonparticipating manufacturer sold cigarettes nationally. When this was the case, the statutes functioned as intended, permitting the NPM to obtain a refund of excess amounts placed in escrow in each state. However, when an NPM followed a regional sales strategy, as several did, the original escrow statutes allowed the NPM to obtain a refund that was much larger than intended.

Miller, supra, at 469 (footnotes omitted).

The "Allocable Share Amendment" ("Amendment") revised the originally enacted escrow statute's refund calculation to remove the reference to the enacting

14

state's "allocable share" of the annual MSA payments. The amended statute, therefore, now provides that an NPM will be entitled to a refund

> [t]o the extent that a tobacco product manufacturer establishes that the amount it was required to place into escrow, based on units sold in the state . . . in a particular year, was greater than the [MSA] payments, as determined pursuant to section IX(i) of that agreement including, after final determination of all adjustments, that such manufacturer would have been required to make based on such units sold had it been a participating manufacturer, the excess shall be released from escrow and revert back to such tobacco product manufacturer.

Kan. Stat, § 50-6a03(b)(2)(B) (2005); see also Okla. Stat. tit. 37; § 600.23(B)(2).[5]

Thus, an NPM still has to pay annually into a state's escrow fund an amount calculated by multiplying the number of cigarettes the NPM sells in that state during the year in question by the same per-cigarette amount for that year as set forth in the state's escrow statute. The NPM can obtain a refund to the extent

[5]There are two minor variations between the Kansas statute and the amended Oklahoma statute. First, the Oklahoma statute places the comma following "as determined pursuant to Section IX(i) of that Agreement" in a different place than the above-quoted Kansas statute–that is, the Oklahoma statute states "of that Agreement, including after final determination of all adjustments." Okla. Stat. tit. 37, § 600.23(B)(2). Second, the Oklahoma statute added to the end of this provision "shall be released from escrow and revert back to such tobacco product manufacturer, unless otherwise provided for by subsection C or D of this section." Subsection C of the Oklahoma statute provides that "[i]f this act, or any portion of the amendment to paragraph 2 of subsection B of this section made by this act [the "allocable share amendment"], is held by a court of competent jurisdiction to be unconstitutional, then paragraph 2 of subsection B of this section shall have no force and effect." Okla. Stat. tit. 37, § 600.23(C). And subsection D adds a provision that becomes effective if the Allocable Share Amendment is held to be unconstitutional and "if, thereafter, a court of competent jurisdiction finds that subsection B of this section without the provisions of paragraph 2 of subsection B of this section is unconstitutional." Id. § 600.23(D).

15

those escrowed funds are greater than the amount that the NPM would have had to pay under the MSA for that same year, based upon that same number of cigarettes sold.

One of Plaintiffs' complaints is that, under the Allocable Share Amendment, Kansas and Oklahoma get to keep more of an NPM's payment than if that manufacturer had been participating in the MSA. The reason for this is that Oklahoma, for example, gets just over 1% of the annual MSA payment made to all settling states. That percentage is fixed and will never change. Therefore, it may not accurately reflect the percentage of national cigarette sales made in Oklahoma for a given year. So even if 2% of the national cigarette sales for a given year occurred in Oklahoma, Oklahoma still receives only 1% of the annual MSA payment for that year. On the other hand, because an NPM's escrow payments are based upon the specific number of cigarettes the NPM sells in Oklahoma during that same year, that amount could increase (or decrease) from the amount represented by 1% of the MSA payment Oklahoma would have received, had the NPM instead joined the MSA.

For most of Plaintiffs' theories of recovery, the fact that Kansas and Oklahoma might receive more from an NPM than if the NPM had chosen to join the MSA does not matter. What is relevant to Plaintiffs' theories is the amount that the NPM must pay. And that amount should, on a per-cigarette basis, be roughly the same as the per-cigarette cost to a manufacturer making payments

16

under the MSA.

## D. Oklahoma Litigation

Xcaliber is an Oklahoma limited liability company based in Pryor, Oklahoma. It began its business in 2001, after the MSA was executed and took effect. Xcaliber has chosen not to join the MSA and, therefore, is an NPM. KT&G is a Korean corporation that sells cigarettes in the United States and specifically in Oklahoma. It, too, has declined to join the MSA.

The Oklahoma legislature enacted the Allocable Share Amendment in 2003; it took effect January 1, 2005. In December 2004, Xcaliber and KT&G filed suit in the Northern District of Oklahoma ("Oklahoma district court") against the Oklahoma attorney general, W.A. Drew Edmondson, in his official capacity ("Oklahoma"). In that action, Plaintiffs challenged only the Allocable Share Amendment, and specifically did not challenge either the MSA or the originally enacted escrow statute.[6] Plaintiffs allege that the Allocable Share Amendment

_____

[6] See Okla. R. at 22 ("Plaintiffs bring this action to enjoin preliminarily and permanently defendant's enforcement of a recent amendment to the Oklahoma Escrow Statute"); 23 ("Without prejudice to their rights to challenge the entirety of the Oklahoma Escrow Statute, the Plaintiffs are challenging the anticompetitive Allocable Share Amendment and the precarious constitutional balance that it has upset under the MSA."); 24 ("Plaintiffs seek declaratory and injunctive relief . . . to prevent the Attorney General from enforcing the Allocable Share Amendment."); 35 ("Plaintiffs respectfully request this Court to grant . . . [a] declaratory judgment in favor of the Plaintiffs that the Allocable Share Amendment violates the Sherman Act, U.S. Constitution, and Oklahoma Constitution on its face and as applied to the Plaintiffs" and "[a]n injunction preliminarily and permanently enjoining Defendant from implementing and
(continued...)

17

violates the Sherman Act, 15 U.S.C. § 1, and the United States and Oklahoma constitutions.

The Oklahoma district court dismissed Plaintiffs' constitutional claims under Fed. R. Civ. P. 12(b)(6), concluding those causes of action failed to state a claim on which relief could be granted. The court heard evidence on the remaining Sherman Act claims, after which the court granted Oklahoma summary judgment on those claims. The district court later denied Plaintiffs' post-judgment motions for relief from judgment.

KT&G appeals the Oklahoma district court's decisions in appeal No. 05-5175, while Xcaliber appeals those decisions in appeal No. 05-5178.

------

[6](...continued)

enforcing the Allocable Share Amendment."); see also id. at 38 (Plaintiffs' motion seeking "a preliminary injunction enjoining Defendant from implementing and enforcing a recent amendment to the Oklahoma Escrow Statute"); id. at 346 (Plaintiffs arguing orally to district court that "[w]e have not brought an action against the master settlement agreement or the basic escrow statute"); 372 (KT&G, in opposing motion to dismiss, asserting that it "does not challenge the Escrow Statute, but, rather, its recent amendment as being in violation of the Constitution and federal law. The Complaint alleges that the amendment (not the Escrow Statute) furthers a regulatory scheme and agreement among competitors that restricts output and forces Plaintiff [KT&G] to raise prices beyond levels at which it can effectively compete against manufacturers that have joined the MSA."); 1240 (asserting, in Plaintiffs' surreply opposing motion to dismiss, that "Plaintiffs' antitrust and constitutional challenges are focused narrowly on the Amendment;" denying Oklahoma's assertion that Plaintiffs are, instead, "challenging the entire MSA"); 3144 (Plaintiffs orally arguing to district court that, while they believe that the original escrow statute was also illegal, they did not sue to challenge that statute because "the price difference was not that great. We could survive. What happened with the Escrow Amendment is, they're putting us out of business."); see also Xcaliber's (Okla.) Br. at 5; KT&G's Br. at 18.

18

**E.      Kansas Litigation**

The Kansas legislature enacted the Allocable Share Amendment in 2005. Later that same year, Xcaliber filed suit in Kansas district court against the then Kansas attorney general, Phill Kline, in his official capacity ("Kansas"), asserting that the Amendment violated the Sherman Act and the United States and Kansas constitutions.  Xcaliber's complaint was substantively identical to the complaint Plaintiffs had filed in the Oklahoma action, except that Xcaliber did not assert a claim under the Commerce Clause in its Kansas litigation.

Like the Oklahoma action, in this Kansas litigation, Xcaliber challenged only the Allocable Share Amendment, and specifically did not challenge either the MSA or the originally enacted Kansas escrow statute.[7]  The district court dismissed Xcaliber's free speech and equal protection claims under Fed. R. Civ. P. 12(b)(6), after concluding those causes of action failed to state a claim upon which relief could be granted.  The district court later granted Kansas summary

_____

[7]See Kan. R. at 15-17, 27 (Xcaliber making the same allegations Plaintiffs made in the Oklahoma litigation, seeking to enjoin only the Allocable Share Amendment); see also id. at 29 (Xcaliber seeking "a preliminary injunction enjoining Defendant . . . from implementing and enforcing a recent amendment to the Kansas Escrow Statute"); 794-95 (Xcaliber arguing, in opposition to motion to dismiss, that "[i]n an effort to deflect attention from the challenged Amendment of Kansas' Escrow Statute (or 'Allocable Share Amendment'), the Attorney General attempts to turn this appeal [sic] into a challenge of the MSA.  Xcaliber has made clear that its antitrust and constitutional claims are limited to Kansas' Amendment to the Escrow Statute.  The MSA and the original Escrow Statute did not achieve the unconstitutional effects that Kansas' Amendment does.") (citations omitted); 2282, 2294 (Xcaliber asserting to the district court that it is challenging the amendment); Xcaliber's (Kan.) Br. at 16.

judgment, see Fed. R. Civ. P. 56, on the remaining Sherman Act and due process claims. Xcaliber appeals those decisions in appeal No. 06-3061.

## II. ANALYSIS

**A.    Sherman Act**

Section 1 of the Sherman Act "declare[s] to be illegal" "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations." 15 U.S.C. § 1. Plaintiffs allege that section 1 preempts Kansas's and Oklahoma's Allocable Share Amendments.

"In determining whether the Sherman Act pre-empts a state statute, we apply principles similar to those which we employ in considering whether any state statute is pre-empted by a federal statute pursuant to the Supremacy Clause." Rice v. Norman Williams Co., 458 U.S. 654, 659 (1982). Congress has "the authority, in exercising its Article I powers, to pre-empt state law." California v. ARC Am. Corp., 490 U.S. 93, 100 (1989) (addressing Sherman Act preemption). Although Congress can expressly preempt state law, see id., we do not have that situation here.

> In the absence of an express statement by Congress that state law is pre-empted, there are two other bases for finding pre-emption. First, when Congress intends that federal law occupy a given field, state law in that field is pre-empted. Second, even if Congress has not occupied the field, state law is nevertheless pre-empted to the extent it actually conflicts with federal law, that is, when compliance with both state and federal law is impossible, or when the state law stands as an obstacle to

20

the accomplishment and execution of the full purposes and objectives of Congress.

Id. at 100-01 (citations, quotations omitted). Here, Plaintiffs contend that the

Sherman Act preempts the Allocable Share Amendment because that Amendment

conflicts with the Sherman Act.[8]

---

[8]As previously explained, supra, nn. 6 and 7, Plaintiffs have consistently challenged only the Allocable Share Amendment and have expressly disclaimed any challenge to the MSA or the original escrow statute enacted by Kansas and Oklahoma. This is understandable because it is the MSA, in combination with the original escrow statute, that provided the environment in which Plaintiffs were able to develop their business niche. Plaintiffs' claim specifically is that the MSA and its original escrow statute were intended to be anti-competitive, contrary to the Sherman Act, but they did not succeed. Because Plaintiffs were able to flourish under that scheme, they have no real complaints about it. Their complaint is instead with the Allocable Share Amendment, which Plaintiffs assert did succeed in making the entire MSA scheme anti-competitive. As relief, Plaintiffs seek, not to overturn the MSA and all of its accompanying legislation, but simply to eliminate the Allocable Share Amendment and return to the MSA and its original escrow statute.

The fact that Plaintiffs are expressly not challenging the MSA and the original escrow statutes distinguishes these appeals from several of the cases on which Plaintiffs rely, cases which instead addressed Sherman Act claims specifically challenging the MSA and its original implementing statutes. See Freedom Holdings, Inc. v. Spitzer, 357 F.3d 205, 208-09, 222 (2d Cir. 2004) (addressing Sherman Act challenge to New York's contraband statutes implementing the MSA); A.D. Bedell Wholesale Co. v. Philip Morris Inc., 263 F.3d 239, 241, 244-45, 247 (3d Cir. 2001) (addressing Sherman Act challenges to the MSA and its original qualifying statute); see also Freedom Holdings, Inc. v. Spitzer, 363 F.3d 149, 152 (2d Cir. 2004) (opinion denying reh'g).

Moreover, these cases on which Plaintiffs rely are appeals from the denial of motions to dismiss Sherman Act claims under Fed. R. Civ. P. 12(b)(6). See Freedom Holdings, 363 F.3d at 151; Freedom Holdings, 357 F.3d at 208; Bedell, 263 F.3d at 241. In addressing such a motion, the court must accept the plaintiff's well-pled allegations as true. Here, on the other hand, Plaintiffs are

(continued...)

Both district courts granted Kansas and Oklahoma summary judgment on Plaintiffs' Sherman Act claims. This court reviews summary judgment decisions de novo, viewing the record in the light most favorable to the parties opposing the motion, KT&G and Xcaliber. See Shero v. City of Grove, 510 F.3d 1196, 1200 (10th Cir. 2007). Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

In determining whether the Sherman Act preempts the Allocable Share Amendment, the relevant inquiry is

> whether there exists an irreconcilable conflict between the federal and state regulatory schemes. The existence of a hypothetical or potential conflict is insufficient to warrant the pre-emption of the state statute. A state regulatory scheme is not pre-empted by the federal antitrust laws simply because in a hypothetical situation a private party's compliance with the statute might cause him to violate the antitrust laws. A state statute is not preempted by the federal antitrust laws simply because the state scheme might have an anticompetitive effect.
>
> A party may successfully enjoin the enforcement of a state statute only if the statute on its face irreconcilably conflicts with federal antitrust policy.

Rice, 458 U.S. at 659 (citations omitted). "[A] state statute should be struck down on pre-emption grounds 'only if it mandates or authorizes conduct that

---

[8](...continued)
appealing the district court's decision to grant the States summary judgment on Plaintiffs' Sherman Act claims.

necessarily constitutes a violation of the antitrust laws in all cases, or if it places irresistible pressure on a private party to violate the antitrust laws in order to comply with the statute.'" Fisher v. City of Berkeley, 475 U.S. 260, 265 (1986) (quoting Rice, 458 U.S. at 661).

In arguing that the Sherman Act preempts the Allocable Share Amendment, Plaintiffs rely on two theories: 1) the Allocable Share Amendment is a per se violation of the Sherman Act; and 2) the Amendment creates a "hybrid restraint" on competition that violates the Sherman Act. See id. at 261, 265-68 (considering both of these theories in support of a claim alleging that the Sherman Act preempted a municipal ordinance).

### 1. Per se violation

As a starting point, we reiterate that "a state statute should be struck down on pre-emption grounds 'only if it mandates or authorizes conduct that necessarily constitutes a violation of the antitrust laws in all cases, or if it places irresistible pressure on a private party to violate the antitrust laws in order to comply with the statute.'" Id. at 265 (quoting Rice, 458 U.S. at 661). We, therefore, inquire whether "the conduct contemplated by the [Amendment] is in all cases a per se violation" of the Sherman Act. Rice, 458 U.S. at 661.

Plaintiffs contend that the Allocable Share Amendment is a per se violation of the Sherman Act because it implements the MSA, which is itself an agreement among competing cigarette manufacturers to limit their cigarette output and which

23

penalizes participating manufacturers who do not do so.[9]  We cannot agree.

The Allocable Share Amendment itself simply requires that NPMs make annual escrow payments, based upon the number of cigarettes an NPM sells in that particular state.  This annual escrow payment is calculated by multiplying the number of cigarettes the NPM sells in that state in a given year by a per-cigarette amount established by the state's legislature.  The Allocable Share Amendment caps an NPM's annual escrow payment by referencing the amount the NPM would have had to pay under the MSA for that year, based upon its sale of the same number of cigarettes.

On its face, then, the Amendment does not mandate or authorize conduct that violates the Sherman Act in every case.  Nor does it "'place[] irresistible pressure on a private party to violate the antitrust laws in order to comply with the statute.'"  Fisher, 475 U.S. at 265 (quoting Rice, 458 U.S. at 661).  Plaintiffs conceded as much in the district court.

The Sixth Circuit reached this same conclusion in Trient International Corp. v. Kentucky, 467 F.3d 547, 555-58 (6th Cir. 2006).  So, too, have a number

---

[9]Plaintiffs also complain that the MSA does not require exempt SPMs to make any annual payments so long as they do not increase their market share.  That, however, is not a result of the Allocable Share Amendment, but instead is a feature of the MSA itself, which Plaintiffs expressly do not challenge.  Plaintiffs' complaint is, instead, that under the MSA and the originally enacted escrow statute, the NPMs had been able to compete with the exempt SPMs, even though the MSA did not require them to make an annual payment (unless the exempt SPM increased its market share).  But Plaintiffs can no longer compete with exempt SPMs after the states enacted the Allocable Share Amendment.

24

of district courts.  See Int'l Tobacco Partners, Ltd. v. Kline, 475 F. Supp. 2d 1078, 1080, 1086-87 (D. Kan. 2007); Int'l Tobacco Partners, Ltd. v. Beebe, 420 F. Supp. 2d 989, 994-97 (W.D. Ark. 2006); Grand River Enters. Six Nations, Ltd. v. Beebe, 418 F. Supp. 2d 1082, 1089-91 (W.D. Ark. 2006); Dos Santos v. Beebe, 418 F. Supp. 2d 1064, 1071-73 (W.D. Ark. 2006); S&M Brands, Inc. v. Summers, 393 F. Supp. 2d 604, 629 (M.D. Tenn. 2005) (holding that neither Tennessee's Allocable Share Amendment nor the MSA itself represented a per se violation of the Sherman Act), aff'd, 228 Fed. App'x 560 (6th Cir. 2007) (unpublished); cf. Grand River Enters. Six Nations, Ltd. v. Pryor, No. 02-Civ. 5068, 2006 WL 1517603, at *8-*9 (S.D.N.Y. May 31, 2006) (denying preliminary injunction enjoining application of allocable share amendment in part because there was no likelihood of success, in light of the plaintiff's inability to establish a per se violation of the Sherman Act), aff'd, 481 F.3d 60 (2d Cir. 2007).  But see Freedom Holdings, Inc. v. Spitzer, 447 F. Supp. 2d 230, 248, 259-60, 265 (S.D.N.Y. 2004) (granting preliminary injunction enjoining enforcement of New York's Allocable Share Amendment, after concluding that the plaintiff had shown a reasonable likelihood of success on its claim that the Amendment was a per se violation of the Sherman Act), aff'd, 408 F.3d 112 (2d Cir. 2005); Xcaliber Int'l Ltd., LLC v. Foti, No. 04-0069, 2006 WL 2990126, at *1-*2 (E.D. La. Oct. 18, 2006) (refusing to dismiss, under Fed. R. Civ. P. 12(b)(6), claim that Louisiana's Allocable Share Amendment amounted to a per se violation of the Sherman Act;

25

accepting as true plaintiffs' allegations that the "restraints created, implemented and enforced pursuant to" the amendment are per se violations of the Sherman Act because the amendment "creates and implements a cost-sharing agreement and output cartel in the domestic market for cigarettes, which has the purpose of raising prices to monopolistic levels, thereby protecting the market shares of the original participating manufacturers and driving smaller competitors from the market" (alterations, quotations omitted)).

Plaintiffs argue that the Sherman Act, nevertheless, preempts the Allocable Share Amendment if the Amendment has an anticompetitive "effect." But that is incorrect. The Supreme Court held in <u>Rice</u> that "[a] state statute is <u>not</u> preempted by the federal antitrust laws simply because the state scheme might have an anticompetitive effect." 458 U.S. at 659 (emphasis added); <u>see also</u> <u>Fisher</u>, 475 U.S. at 264 (noting that this is so because "the function of government may often be to tamper with free markets, correcting their failures and aiding their victims"); <u>Exxon Corp. v. Governor of Md.</u>, 437 U.S. 117, 133 (1978) (noting that, "if an adverse effect on competition were, in and of itself, enough to render a state statute invalid, the States' power to engage in economic regulation would be effectively destroyed"). Instead, "[a] party may successfully enjoin the enforcement of a state statute only if the statute <u>on its face</u> irreconcilably conflicts with federal antitrust policy." <u>Rice</u>, 458 U.S. at 659 (emphasis added).

Moreover, the circumstances here are very different from the cases where

26

the Supreme Court has held that the Sherman Act preempts a state law. In California Retail Liquor Dealers Association v. Midcal Aluminum, Inc., 445 U.S. 97 (1980), for example, the Supreme Court held that a California statute that expressly required members of the wine industry to file fair trade contracts or price schedules that would establish the price for wine sales amounted to a per se violation of the Sherman Act. See id. at 99-100, 102-03.

Similarly, in 324 Liquor Corp. v. Duffy, 479 U.S. 335 (1987), a New York statute expressly required liquor wholesalers each month to "post" monthly price schedules. See id. at 337-38. The law further required retailers to charge their customers 112% of these "posted" prices. See id. at 337-40. The statute "applie[d] to all wholesalers and retailers of liquor," and made retailers "subject to penalties for failure to adhere to the resale price schedules." Id. at 342. The Supreme Court concluded that this statutory scheme "directly restricts retail prices," requiring "resale price maintenance," which is vertical price fixing that is per se illegal under the Sherman Act. See id. at 341-42. Therefore, the Court held that this statute was "inconsistent" with, and thus preempted by, the Sherman Act. See id. at 343, 345 n.8.

Here, however, the Allocable Share Amendment only requires NPMs to make an annual escrow payment, based upon the number of cigarettes that the NPM sells in the state in a given year multiplied by a per-cigarette amount established by the state legislature. The fact that the amount of that escrow

27

payment is capped by referencing the amount that the NPM would have paid under the MSA on that same volume of sales does not change the fact that the statute, on it face, does not mandate or authorize conduct that is a per se violation of the Sherman Act in all cases.

## 2. Hybrid restraint

Plaintiffs next allege that the Allocable Share Amendment creates a hybrid restraint of trade that conflicts with the Sherman Act. Again our starting point is the premise that "a state statute should be struck down on pre-emption grounds 'only if it mandates or authorizes conduct that necessarily constitutes a violation of the antitrust laws in all cases, or if it places irresistible pressure on a private party to violate the antitrust laws in order to comply with the statute.'" Fisher, 475 U.S. at 265 (quoting Rice, 458 U.S. at 661).

"A hybrid restraint is [another] form of state law that is per se illegal under the Sherman Act." Sanders v. Brown, 504 F.3d 903, 918 (9th Cir. 2007) (citing Fisher, 475 U.S. at 267-70). "Certain restraints may be characterized as 'hybrid,' in that nonmarket mechanisms merely enforce private marketing decisions. Where private actors are thus granted a degree of private regulatory power, the regulatory scheme may be attacked under § 1" of the Sherman Act. Fisher, 475 U.S. at 267-68 (citations, quotations omitted). A hybrid restraint, thus, "exists when the state passes laws that enforce companies' decisions to collude on prices, to dictate prices by which other companies must abide, or to otherwise violate the

28

Sherman Act." Sanders, 504 F.3d at 918.

In support of their hybrid-restraint theory, Plaintiffs again assert that the Allocable Share Amendment implements the MSA, which is an agreement among private cigarette manufacturers to limit their cigarette production output and which penalizes participating manufacturers who do not do so. This, according to Plaintiffs, permits manufacturers participating in the MSA to increase prices without fear of competition.[10]

The Allocable Share Amendment, however, does not authorize or permit private parties to make anticompetitive decisions that will then be enforced by the state. Rather, it is the state legislatures that set the per-cigarette amount, which is multiplied by the number of cigarettes that that NPM sells in the state in a given year to calculate an NPM's annual escrow payment. It is true that an NPM's annual escrow payment is capped by the amount the NPM would have to pay under the MSA. And calculating the amount an NPM would have to pay each year under the MSA will vary depending upon a number of factors, including the cigarette sales and market shares of those manufacturers participating in the MSA. That connection, however, to the conduct of private entities is too

---

[10]It is once again worth noting that Plaintiffs are not challenging the MSA for the obvious reason that they benefit from the MSA by itself. It is only the Allocable Share Amendment that Plaintiffs allege restrains competition at the level where they operate, and accordingly the alleged restraint they specifically challenge is the Amendment, set of course in the context of the MSA. See supra, nn. 6,7.

attenuated for this court to conclude that Kansas and Oklahoma have delegated regulatory power to these private individuals.

Our conclusion is bolstered by considering the cases in which the Supreme Court has previously found a hybrid restraint to exist. In Schwegmann Brothers v. Calvert Distillers Corp., 341 U.S. 384 (1951), the Court considered a Louisiana statute that "authorized a distributor to enforce agreements fixing minimum retail prices not only against parties to such contracts, but also against retailers who sold the distributor's products without having agreed to the price restrictions." Fisher, 475 U.S. at 268 (describing Schwegmann). In Schwegmann,

> the Court held that two liquor distributors had violated [the Sherman Act's] § 1 when they attempted to hold a retailer to the price-fixing terms of a contract it had refused to sign. In so holding, the Court noted that "when a state compels retailers to follow a parallel price policy, it demands private conduct which the Sherman Act forbids." 341 U.S., at 389 . . . . However, under the Louisiana statute, both the selection of minimum price levels and the exclusive power to enforce those levels were left to the discretion of distributors. While the petitioner-retailer in that case may have been required to adhere to the levels so selected, the involvement of his suppliers in setting those prices made it impossible to characterize the regulation as unilateral action by the State of Louisiana.

Fisher, 475 U.S. at 268.

Likewise, in Midcal, the state regulatory scheme "entailed a similar degree of free participation by private economic actors." Fisher, 475 U.S. at 268. Midcal addressed a Sherman Act challenge to a California law, discussed above, that required wine producers, or wholesalers in their stead, to set retail prices for the

30

producer's product. See Midcal, 445 U.S. at 99. The state had no control over the prices set by the wine producers and did not review the prices for reasonableness, but the state did enforce the prices set by the wine producers. See id. at 99-100.

The Supreme Court noted that the New York liquor distribution statute in 324 Liquor was also a hybrid restraint. See 379 U.S. at 345 n.8. As in Midcal, the New York statute at issue there required private parties, liquor wholesalers, to set the prices retailers would pay for the liquor they purchased and then the state enforced those prices. See id. at 337-40.

The state statutes at issue in these three cases, which the Supreme Court held created hybrid restraints on competition, expressly delegated regulatory authority to private actors. See Sanders, 504 F.3d at 918-19. That is simply not the case here.

The Allocable Share Amendment is, instead, more analogous to the municipal ordinance the Supreme Court addressed in Fisher. There, the electorate of the City of Berkeley, California, enacted a rent control ordinance. See 475 U.S. at 261-62. That

> Ordinance establishe[d] a base rent ceiling reflecting the rents in effect at the end of May 1980. A landlord may raise his rents from these levels only pursuant to an annual general adjustment of rent ceilings by a Rent Stabilization Board of appointed commissioners or after he is successful in petitioning the Board for an individual adjustment. A landlord . . . who fails to adhere to the maximum allowable rent set under the Ordinance may be fined by the Board, sued by his tenants, or have rent legally withheld from him. If his violations are willful, he may face criminal penalties.

Id. at 262-63.

31

The Supreme Court held that this ordinance did not amount to a hybrid restraint:

> The hybrid restraints condemned in <u>Schweggman</u> and <u>Midcal</u> were . . . quite different from the pure regulatory scheme imposed by Berkeley's Ordinance. While the Ordinance does give tenants–certainly a group of interested private parties–some power to trigger the enforcement of its provisions, it places complete control over maximum rent levels exclusively in the hands of the Rent Stabilization Board. Not just the controls themselves but also the rent ceilings they mandate have been unilaterally imposed on the landlords by the city.

<u>Id.</u> at 269.

Similarly, in this case, the state legislatures require NPMs to make annual escrow payments, calculated by multiplying the number of cigarettes the NPM sells in that state by a legislatively-created per-cigarette amount. The fact that the payments are capped by reference to the MSA does not amount to delegating regulatory authority to private parties. <u>See</u> <u>Int'l Tobacco Partners, Ltd.</u>, 420 F. Supp. 2d at 994-97; <u>Grand River Enters. Six Nations, Ltd.</u>, 418 F. Supp. 2d at 1089-91; <u>Dos Santos</u>, 418 F. Supp. 2d at 1072-73 (W.D. Ark. 2006); <u>S&M Brands</u>, 393 F. Supp. 2d at 630 (holding neither Tennessee's Allocable Share Amendment or the MSA was a hybrid restraint); <u>cf.</u> <u>Grand River Enters. Six Nations</u>, 2006 WL 1517603, at *9 (denying request for preliminary injunction, after concluding plaintiff had not established likelihood of success on Sherman Act claim challenging New York's Allocable Share Amendment because plaintiff had failed to establish a per se violation; rejecting argument that Allocable Share Amendment was a hybrid

restraint).

Moreover, Plaintiffs have failed to assert evidence, sufficient to survive summary judgment, in support of their allegations that the Allocable Share Amendment's referencing the MSA to cap an NPM's annual escrow payments enables private actors to manipulate the amount of escrow payments an NPM must make. Nor did Plaintiffs present any evidence that the manufacturers participating in the MSA have otherwise been wielding regulatory power granted them by the Allocable Share Amendment. In particular, Plaintiffs' allegations that the participating manufacturers were actively involved in drafting this legislation and in getting it enacted are not sufficient to establish that the Allocable Share Amendment then grants these manufacturers private regulatory power.

Furthermore, Plaintiffs' evidence supporting their assertion that the Allocable Share Amendment is anti-competitive because it implements the MSA, which is itself anti-competitive, is insufficient to survive summary judgment. Other than their own allegations, Plaintiffs have produced no evidence that the MSA itself penalizes manufacturers for increasing their market share to such a degree that those manufacturers will refrain from unilaterally making their own pricing and production decisions. Instead, the evidence indicates that the OPMs, SPMs, and NPMs all pay roughly the same amount for each cigarette sold. The exempt SPMs, too, will pay roughly this same amount when their sales exceed their protected market share. In light of the fact that these manufacturers all face roughly the same per-cigarette cost

33

under either the MSA or the allocable share amendment, there is no indication that they will avoid increasing their own market share, nor is there any suggestion that they will not unilaterally make their own pricing and output decisions. Both Plaintiffs' and the States' experts appear to agree on this point. Plaintiffs, therefore, have failed to assert evidence to the contrary sufficient for their claim to survive summary judgment.

Finally, Xcaliber argues that the Oklahoma district court erred in refusing to consider the additional evidence it asserted in its motion for reconsideration. Xcaliber moved for reconsideration under both Fed. R. Civ. P. 59(e) and 60(b). The district court did not abuse its discretion in denying that motion. See Manning v. Astrue, 510 F.3d 1246, 1249 (10th Cir. 2007) (reviewing denial of Rule 60(b) motion for an abuse of discretion), petition for cert. filed, 76 U.S.L.W. 3637 (U.S. May 22, 2008) (No. 07-1468); Ogden v. San Juan County, 32 F.3d 452, 455 (10th Cir. 1994) (reviewing denial of Rule 59(e) motions for an abuse of discretion).

### 3.    Conclusion

For these reasons, we affirm the district courts' determinations that the Sherman Act did not preempt the Kansas and Oklahoma Allocable Share Amendments. There is, therefore, no need for this court to consider whether state-action immunity, recognized in Parker v. Brown, 317 U.S. 341 (1943), will save these state statutes from preemption. See Rice, 458 U.S. at 662 n.9 (because Court concluded Sherman Act did not preempt the state statute, "it is not

34

necessary for us to consider whether the statute may be saved from invalidation under the [Parker] doctrine"); Tritent, 467 F.3d at 558 (holding that, because the Sherman Act did not preempt statutes implementing the MSA, the court did not need to consider whether Parker's state-action immunity would save those state statutes from preemption); see also Fisher, 475 U.S. at 265 (noting that "[l]egislation that would otherwise be pre-empted . . . may nonetheless survive if it is found to be state action immune from antitrust scrutiny under Parker"); 324 Liquor Corp., 479 U.S. at 342-43, 345 n.8 (determining that state statute was "inconsistent" with Sherman Act, and thus would be preempted, before applying Parker's "state action exemption").

## B. Constitutional claims [11]

### 1. First Amendment claims

Plaintiffs allege that the Allocable Share Amendment violates the First Amendment and "similar" provisions of the Kansas and Oklahoma constitutions. Both the Kansas and Oklahoma district courts dismissed Plaintiffs' First Amendment claims pursuant to Fed. R. Civ. P. 12(b)(6), for failure to state a claim upon which relief could be granted.

---

[11]Plaintiffs argue that the Allocable Share Amendment violates not only the United States Constitution, but also the Oklahoma and Kansas constitutions. Nevertheless, Plaintiffs never identified any relevant provision of either state constitution. Nor do they make any argument in this regard under state constitutional law. We, therefore, assume that Plaintiffs are asserting that the relevant state constitutional provisions are coterminous with the federal constitution.

This court will review those decisions de novo. See Teigen v. Renfrow, 511 F.3d 1072, 1078 (10th Cir. 2007). In doing so, we accept as true all well-pleaded facts and view them in the light most favorable to the non-moving parties, Xcaliber and KT&G. Id. We review the complaint for "plausibility," id.; that is, to determine whether the complaint includes "enough facts to state a claim to relief that is plausible on its face." Bell Atlantic Corp. v. Twombly, 127 S. Ct. 1955, 1970, 1974 (2007); see also Teigen, 511 F.3d at 1078.

In support of their First Amendment claim, Plaintiffs specifically allege that the Allocable Share Amendment "coerces Plaintiffs and other [NPMs] into relinquishing their constitutionally protected First Amendment rights of speech, association and petition, penalizes them for asserting and refusing to waive such rights, conditions receipt of a government entitlement and benefit on the waiver of such rights, and imposes unlawful prior restraint on speech." We address those allegations in turn.

First, Plaintiffs allege that the Allocable Share Amendment coerces them into relinquishing their First Amendment rights to freedom of speech, association and petition. We interpret Plaintiffs' claims to allege that the Allocable Share Amendment makes doing business as an NPM so financially unattractive that it compels NPMs to waive their First Amendment rights and join the MSA. But we reject that argument.

Plaintiffs do not allege that they are worse off doing business as NPMs,

36

subject to the states' escrow statutes, as amended by the Allocable Share Amendment, than they would be if they joined the MSA. Rather, they instead argue that the Allocable Share Amendment requires them to pay more to Kansas and Oklahoma than they would have to pay these individual states if Plaintiffs were members of the MSA.[12] Plaintiffs' theory is this: If they belonged to the MSA, each of them would be required to make annual payments to the MSA's escrow agent. Those payments, along with the annual payments made by the other participating manufacturers, would then be divided between the settling states according to each state's allocable share. Thus, Kansas would receive its allocable share, 0.8336712%, of Plaintiffs' annual payments, while Oklahoma would receive 1.0361370% of Plaintiffs' annual payments (as well as the payments of all other participating manufacturers). The rest of Plaintiffs' annual payments would be divided among the other settling states.

As an NPM under the Allocable Share Amendment, however, Plaintiffs must make escrow payments to Kansas and Oklahoma, based upon the number of

---

[12]For purposes of our discussion here, we treat NPMs' payments into the states' escrow funds, which may be released to the NPMs in twenty-five years and on which the NPMs earn interest, the same as payments participating manufacturers make under the MSA. See generally Simon & Schuster, Inc. v. Members of the New York State Crime Victims Bd., 502 U.S. 105, 116-17 (1991) (noting that, while challenged law at issue in that case "escrows all of the speaker's speech-derived income for at least five years, rather than taxing a percentage of it outright, this difference can hardly serve as the basis for disparate treatment under the First Amendment. Both forms of financial burden operate as disincentives to speak.").

37

cigarettes Plaintiffs sell in those states. Kansas and Oklahoma would keep those funds in escrow, to the extent those funds did not exceed the payments Plaintiffs would have been required to make on those sales under the MSA, had Plaintiffs joined that agreement. If Plaintiffs concentrated their cigarette sales in just a few states, rather than selling nationally, Kansas and Oklahoma would receive more of Plaintiffs' payments than those states would have received from Plaintiffs under the MSA.

The Kansas and Oklahoma district courts properly recognized that Plaintiffs' theory focuses on the wrong inquiry.[13]  See also Int'l Tobacco Partners, Inc., 420 F. Supp. 2d at 997-98 (reaching this same conclusion); Grand River Enters. Six Nations, Ltd., 418 F. Supp. 2d at 1092-93 (same); Dos Santos, 418 F. Supp. 2d at 1074-75 (same).  In determining whether the Allocable Share Amendment burdens Plaintiffs' First Amendment rights, the relevant inquiry is not whether Kansas and Oklahoma will retain more of Plaintiffs' escrow payments than before the Amendment, but rather whether Plaintiffs, as NPMs, must pay more in annual payments than those manufacturers that have chosen to participate in the MSA.  See Int'l Tobacco Partners, 420 F. Supp. 2d at 997-98; Grand River Enters. Six Nations, Ltd., 418 F. Supp. 2d at 1092-93; Dos Santos,

_____

[13]Xcaliber asserts that the district courts erred in failing to accept these allegations as true for Fed. R. Civ. P. 12(b)(6) purposes.  But the district courts did not reject Plaintiffs' allegations; rather, the courts held those allegations focused on the wrong inquiry and therefore were not relevant.

38

418 F. Supp. 2d at 1074-75. In this way, it might arguably be more beneficial financially for Plaintiffs to relinquish their First Amendment rights and join the MSA. But Plaintiffs do not allege any such compulsion to join the MSA.

Instead Plaintiffs must make escrow payments of approximately two cents for each cigarette Plaintiffs sell in Kansas or Oklahoma, which is approximately the same per-cigarette payment Plaintiffs would have to make if they joined the MSA. Therefore, Plaintiffs are no worse off financially as NPMs than if they had joined the MSA. See S&M Brands, Inc., 393 F. Supp. 2d at 637-38. And as NPMs, they retain their First Amendment protections pertaining to advertising, lobbying, and seeking governmental redress. See id. at 638.

Plaintiffs further argue that, as NPMs, they do have to pay more than grandfathered SPMs, which, because they joined the MSA within ninety days of its execution, are exempt from making any annual payments unless the exempt SPMs exceed their 1997 or 1998 market shares by a specific amount. That, however, is a feature of the MSA, which Plaintiffs expressly do not challenge in this action. The Allocable Share Amendment itself does not change that calculus. See Grand River Enters. Six Nations, Ltd. v. Pryor, No. 02 Civ. 5068I JFK, 2003 WL 22232974, at *17 (S.D.N.Y. Sept. 29, 2003) (unpublished) (in action challenging only escrow statute and specifically not challenging the MSA, rejecting First Amendment argument that NPMs "would not be afforded the same financial benefit were they to join the M.S.A. now as those manufacturers who

39

joined earlier received"), vacated in part on reconsideration, 2004 WL 1594869, at *2 (S.D.N.Y. July 15, 2004) (unpublished), aff'd, 425 F.3d 158 (2d Cir. 2005).

Next, Plaintiffs allege that the Allocable Share Amendment conditions their receipt of a government benefit on their waiver of First Amendment rights. The government "may not deny a benefit to a person on the basis that infringes his constitutionally protected interests–especially, his interest in freedom of speech." Perry v. Sindermann, 408 U.S. 593, 597 (1972). This is true even if the person has no entitlement to the benefit and even though the government can deny the benefit for a number of other reasons. See id.; see also United States v. Am. Library Ass'n, Inc., 539 U.S. 194, 210 (2003) (noting "unconstitutional condition" doctrine provides that "the government may not deny a benefit to a person on a basis that infringes his constitutionally protected freedom of speech, even if he has no entitlement to that benefit" (quotations, alteration omitted)).

But in these cases, Plaintiffs have failed to identify the government benefit that enacting the Allocable Share Amendment denies them. It may be that Plaintiffs are protesting their loss of a substantial competitive advantage that they enjoyed under the originally enacted escrow statute. But courts considering such an argument have refused to recognize that competitive advantage as a government benefit. See Int'l Tobacco Partners, 420 F. Supp. 2d at 998; Grand River Enters. Six Nations, Ltd., 418 F. Supp. 2d at 1093; Dos Santos, 418 F. Supp. 2d at 1075.

Moreover, "the focus of the unconstitutional conditions doctrine is on whether a governmental entity is denying a benefit to Plaintiffs that they could obtain by giving up their freedom of speech, or is penalizing them for refusing to give up their First Amendment rights." S&M Brands, Inc., 393 F. Supp. 2d at 637). That is not the case here, however. See id. at 637-38. Even if Plaintiffs agreed now to join the MSA and relinquish their First Amendment rights, they would not gain the "benefit" they seek—the competitive advantage they enjoyed under the originally enacted escrow statute. That competitive advantage is now gone, regardless of what Plaintiffs choose to do. Therefore, Plaintiffs' claim—that Kansas and Oklahoma, as a result of enacting the Allocable Share Amendment, are withholding a government "benefit" until Plaintiffs join the MSA and relinquish their First Amendment rights—fails.

Lastly, Plaintiffs assert that the Allocable Share Amendment "imposes unlawful prior restraint on speech." Because Plaintiffs never asserted an argument in support of that theory, either before the district courts or now on appeal, we deem Plaintiffs to have waived this theory of recovery. See Gross v. Burggraf Constr. Co., 53 F.3d 1531, 1547 (10th Cir. 1995).

For these reasons, the district courts did not err in dismissing Plaintiffs' First Amendment claims under Rule 12(b)(6).

## 2. Equal protection claims

Plaintiffs allege that the Allocable Share Amendment deprives them of the

41

equal protection of the law, in violation of the Fourteenth Amendment and "similar provisions" of the Kansas and Oklahoma constitutions. The Kansas and Oklahoma district courts both dismissed these claims under Rule 12(b)(6), concluding they failed to state a claim upon which relief could be granted. This court will review the district courts' decisions de novo, accepting as true all well-pled factual allegations and viewing them in the light most favorable to Plaintiffs. See Teigen, 511 F.3d at 1078.

The Fourteenth Amendment directs that "[n]o State shall make or enforce any law which shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. "Equal protection is essentially a direction that all persons similarly situated should be treated alike." Trujillo v. Williams, 465 F.3d 1210, 1228 (10th Cir. 2006). That directive is aimed at the State: "equal protection only applies when the state treats two groups, or individuals, differently." Powers v. Harris, 379 F.3d 1208, 1215 (10th Cir. 2004). Plaintiffs allege that the state action they challenge is the Allocable Share Amendment.

Plaintiffs also "must state exactly to which group" they believe they are similarly situated. Trujillo, 465 F.3d at 1228. In this case, Plaintiffs assert that they are similarly situated to the participating manufacturers who have joined the MSA.

Next, we consider by what standard we review the classification drawn by

42

the Allocable Share Amendment that distinguishes between Plaintiffs and those manufacturers that have chosen to participate in the MSA. When a classification targets a suspect class or involves a fundamental right, we will apply strict scrutiny. See Save Palisade FruitLands v. Todd, 279 F.3d 1204, 1210 (10th Cir. 2002). To survive strict scrutiny, the government must show that its classification is narrowly tailored to achieve a compelling government interest. See id. In addition, there is an intermediate scrutiny which applies, for example, to gender-based classifications. See Concrete Works of Colo., Inc. v. City and County of Denver, 321 F.3d 950, 959 (10th Cir. 2003). Such classifications will survive an equal protection challenge if there is "an 'exceedingly persuasive justification' for those measures;" that is, if the government can show that the challenged classification serves an important governmental interest and is substantially related to achieving those objective. Id. (quoting United States v. Virginia, 518 U.S. 515, 524 (1996)). Finally, if a classification does not target a suspect class, involve a fundamental right, or implicate intermediate scrutiny, then "the statute need only be rationally related to a legitimate government purpose." Todd, 279 F.3d at 1210.

Plaintiffs argue that the Allocable Share Amendment is subject to heightened scrutiny because it burdens Plaintiffs' First Amendment rights by treating them less favorably than the manufacturers that have chosen to waive

their First Amendment protections and join the MSA.[14]  We have already

concluded, however, that the Allocable Share Amendment does not burden

Plaintiffs' First Amendment rights.  Therefore, the Allocable Share Amendment

need only be rationally related to a legitimate government interest.[15]

Under rational-basis review, "[t]he government violates the Equal Protection

Clause when it treats someone differently than another who is similarly situated

without a rational basis for the disparate treatment."  <u>Christian Heritage Acad. v.</u>

---

[14]Plaintiffs argue that strict scrutiny should apply because the Allocable Share Amendment burdens their First Amendment rights.  Plaintiffs further argue that, even if strict scrutiny does not apply, intermediate scrutiny should apply because the Allocable Share Amendment burdens at least their First Amendment right to engage in commercial speech.  The First Amendment does protect commercial speech, defined as "expression related solely to the economic interests of the speaker and its audience."  <u>Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n</u>, 447 U.S. 557, 561 (1980).  Nevertheless, because "speech proposing a commercial transaction, which occurs in an area traditionally subject to government regulation," is distinguishable from "other varieties of speech," the Constitution "accords a lesser protection to commercial speech than to other constitutionally guaranteed expression."  <u>Id.</u> at 562-63.  "The protection available for particular commercial expression turns on the nature both of the expression and of the governmental interests served by its regulation."  <u>Id.</u> at 563; <u>see also</u> <u>United States v. Wenger</u>, 427 F.3d 840, 845, 846-47 (10th Cir. 2005) (applying <u>Central Hudson</u>).

[15]In light of this, Plaintiffs' arguments on appeal urging that there are more narrowly tailored means for the states to achieve the end they seek than to enact the Allocable Share Amendment are not germane to our analysis.  <u>See</u> <u>Todd</u>, 279 F.3d at 1210.  Further, because we conclude that the Allocable Share Amendment does not implicate any First Amendment protections, we need not address the district courts' conclusions that the type of "fundamental rights" sufficient to invoke strict scrutiny does not include First Amendment protections.  <u>But see</u> <u>id.</u> (treating right to free speech as fundamental right, for equal protection purposes, that would trigger strict scrutiny; citing <u>McIntyre v. Ohio Elections Comm'n</u>, 514 U.S. 334, 336 n.1 (1995)).

Okla. Secondary Sch. Activities Ass'n, 483 F.3d 1025, 1031 (10th Cir. 2007) (quotation omitted). "As to the rational relationship between the classification and purpose, we require only that the legislative body . . . could rationally have decided that its classification might foster its purpose." Id. at 1033 (quotation omitted). "In most cases, the classification and purpose are rationally related. But the State may not rely on a classification whose relationship to an asserted goal is so attenuated as to render the distinction arbitrary or irrational. We are not constrained by the parties' arguments concerning legitimate state purposes." Id. (quotation, citations, alteration omitted).

> In United States v. Carolene Products Co., 304 U.S. 144, 154 . . . (1938), the [Supreme] Court held, pursuant to rational basis review, that when legislative judgment is called into question on equal protection grounds and the issue is debatable, the decision of the legislature must be upheld if "any state of facts either known or which could reasonably be assumed affords support for it." Second-guessing by a court is not allowed.

> Further, rational-basis review does not give courts the option to speculate as to whether some other scheme could have better regulated the evils in question. In fact, we will not strike down a law as irrational simply because it may not succeed in bringing about the result it seeks to accomplish, or because the statute's classifications lack razor-sharp precision. Nor can we overturn a statute on the basis that no empirical evidence supports the assumptions underlying the legislative choice.

> Finally, "because we never require a legislature to articulate its reasons for enacting a statute, it is entirely irrelevant for constitutional purposes whether the conceived reason for the challenged distinction actually motivated the legislature." [FCC v. ]Beach Communications[, Inc.], 508 U.S. [307,] 315 . . . [(1993)] (citations and quotations omitted). "[T]hose attacking the rationality of the legislative classification have the burden 'to negative every conceivable basis

45

which might support it[.]'" Id. (quoting Lehnhausen v. Lake Shore Auto Parts Co., 410 U.S. 356, 364 . . . (1973). As such, we are not bound by the parties' arguments as to what legitimate state interests the statute seeks to further. In fact, this Court is obligated to seek out other conceivable reasons for validating a state statute.

Powers, 379 F.3d at 1216-17 (additional quotations, citations, alterations omitted); see also Star Scientific, Inc. v. Beales, 278 F.3d 339, 343-44, 350-51 (4th Cir. 2002) (applying similar rational basis test to equal protection challenge to originally enacted escrow statute). In light of this standard for rational-basis review, several of Plaintiffs' arguments are irrelevant to our equal protection analysis, including Plaintiffs' assertions that there is no evidence to suggest that the Allocable Share Amendment will reduce underage smoking and that a better way to reduce smoking would be through imposing a flat tax.

The stated purpose of the escrow statute at issue here is to insure that the state will have an eventual source of recovery from the NPMs if they are proven to have acted culpably. It is thus in the interest of the state to require that such manufacturers establish a reserve fund to guarantee a source of compensation and to prevent such manufacturers from deriving large, short-term profits and then becoming judgment-proof before liability may arise. See Kan. Stat. § 50-6a01(f); Okla. Stat. tit. 37, § 600.21(D). Insuring the availability of these funds serves the states' interest in promoting public health. Further, basing the amount of an NPM's escrow payments on the number of cigarettes the NPM sells in that state insures that there will be a sufficient reserve available should the state recover a

46

judgment against the NPM that directly ties those escrow reserves to the amount of harm an NPM's cigarettes may do in that state.  See Pryor, 425 F.3d at 175 (recognizing that promoting public health and recovering costs of tobacco-related illnesses are legitimate state interests served by originally enacted escrow statute).

Plaintiffs allege that the Allocable Share Amendment treats them differently than the cigarette manufacturers participating in the MSA, and that this differing treatment is not rationally related to those government interests. But the amended Escrow statutes require that any cigarette manufacturer that does business in Kansas or Oklahoma either join the MSA or make escrow payments pursuant to that statute.  See Kan. Stat. § 50-6a03; Okla. Stat. tit. 37, § 600.23(A). In that regard, the escrow statutes treat all cigarette manufacturers equally.  And those statutes require that an NPM make annual payments into that state's escrow fund, based upon the number of cigarettes that NPM sold in that particular state in a given year.  See Kan. Stat. § 50-6a03(b)(1); Okla. Stat. tit. 37, § 600.23(A)(2). Further, this per cigarette amount is essentially the same as the manufacturers participating in the MSA pay.[16]

---

[16]KT&G asserts that the OPMs' payments made under the MSA are further reduced by a "Previously Settled States Reduction," which does not apply to NPMs.  But that reduction credits the annual amounts OPMs have agreed to pay under the MSA for payments those OPMs made to four states with which the OPMs had previously settled, prior to entering into the MSA.  In this respect, the OPMs are not similarly situated to Plaintiffs and other NPMs, which have not

(continued...)

Plaintiffs argue that the Allocable Share Amendment treats them differently than exempt SPMs, who do not have to make <u>any</u> annual payments under the MSA, so long as they do not increase their market share beyond 1997 and 1998 levels. We agree with the Fourth Circuit, which has rejected a similar equal protection challenge to the MSA and its related statutes:

> Although it is true that the [escrow] statute creates distinctions among tobacco manufacturers based on whether a manufacturer signs the Master Settlement Agreement, the distinctions are rationally related to [the states'] legitimate purpose of ensuring a source of recovery from <u>all</u> manufacturers for [the states'] future costs related to cigarette smoking.
>
> For those manufacturers sued by [the states] for wrongdoing, the Master Settlement Agreement mandates not only strict conduct restrictions but also nonrefundable payments in perpetuity. Manufacturers joining the agreement as Subsequent Participating Manufacturers–those manufacturers who were not sued for wrongdoing–while not required to make the same payments as the original participating manufacturers, nevertheless agree to be bound by conduct restrictions. In contrast, nonparticipating manufacturers are subject to no conduct restrictions, and their payments in escrow last for only 25 years. In addition, these manufacturers receive interest on the funds while they are held in escrow, and the principal is fully refundable if the money is not needed to pay a judgment in a tobacco-related law-suit. Thus, the refundability of the payments is directly related to the nonparticipating manufacturers' future liability for tobacco-related losses.
>
> Thus, the distinctions between manufacturers signing the Master Settlement Agreement and manufacturers not signing are rationally related to their status <u>vel non</u> as defendants, their willingness to agree to conduct limitations, and [the states'] need to ensure a source of recovery for all future tobacco-smoking related healthcare costs. All

[16](...continued)
settled with other states.

manufacturers thus bear responsibility in differing manners and degrees for limiting the [states'] future liability for these costs. Those manufacturers who have not admitted to any wrongdoing and who do not wish to limit their future conduct retain the ability to manufacture and market their product in the manner they pursued before, but they essentially provide a surety bond against future liability for tobacco-smoking related healthcare costs.

Star Scientific, 278 F.3d at 351-52; see also Pryor, 425 F.3d at 175 (holding escrow statute did not deprive NPMs of equal protection of the law because that statute is rationally related to legitimate state interests, including promoting health and recovering costs for tobacco-related illnesses).

Plaintiffs also argue that the Allocable Share Amendment treats them differently than the participating manufacturers by requiring Plaintiffs to deposit more money into Kansas's and Oklahoma's escrow accounts than Plaintiffs would have to pay to each of these states if Plaintiffs agreed instead to join the MSA and make annual payments to the MSA's national escrow fund, which would then be divided among all settling states according to each state's allocable share. But that distinction is rationally related to the States' legitimate government purpose of insuring an adequate escrow fund to insure future tobacco-related health costs.

Similarly, Plaintiffs assert that the states, through the Allocable Share Amendment, will get to keep a greater amount of the escrowed funds than they would have received had Plaintiffs joined the MSA. But "[i]t is not what [the states] would receive under the MSA, but what [Plaintiffs] would pay, that is relevant" to the equal protection analysis. Dos Santos, 418 F. Supp. 2d at 1076.

49

Plaintiffs also assert that the Amendment requires Plaintiffs and other NPMs "to make greater payments" than those manufacturers participating in the MSA. We interpret this as Plaintiffs rearguing their contention that Kansas and Oklahoma will get more of Plaintiffs' annual escrow payment than these states would have gotten under the MSA. We again reject that contention.

For these reasons, we conclude the district courts did not err in dismissing Plaintiffs' equal protection claims for failure to state a claim on which relief can be granted. See Star Scientific, 278 F.3d at 352; see also Pryor, 425 F.3d at 175; Int'l Tobacco Partners, 420 F. Supp. 2d at 998-99; Grand River Enters. Six Nations, Ltd., 418 F. Supp. 2d at 1093-94; Dos Santos, 418 F. Supp. 2d at 1075-76; PTI, Inc. v. Philip Morris, Inc., 100 F. Supp. 2d 1179, 1207-08 (C.D. Cal. 2000).

### 3. Procedural due process

Plaintiffs allege that the Allocable Share Amendment effects a prejudgment seizure of their property, to the extent the Amendment requires them to put more money into the States' escrow funds than Plaintiffs were required to pay under the original escrow statutes, without providing due process as required by the Fourteenth Amendment and "similar sections" of the Kansas and Oklahoma constitutions.

The Oklahoma district court dismissed Plaintiffs' due process claim under Rule 12(b)(6) for failure to state a claim on which relief could be granted. We

50

review that decision de novo, accepting as true Plaintiffs' well-pled allegations. See Teigen, 511 F.3d at 1078.

The Kansas district court, on the other hand, granted Kansas summary judgment on Xcaliber's procedural due process claim. We also review that determination de novo, viewing the record in the light most favorable to the non-moving party, Xcaliber. See Shero, 510 F.3d at 1200.

"The requirements of procedural due process apply only to the deprivation of interests encompassed by the Fourteenth Amendment's protection of liberty and property. When a State seeks to terminate a protected property interest, the right to notice and opportunity for a hearing is usually paramount." Darr v. Town of Telluride, 495 F.3d 1243, 1251 (10th Cir. 2007) (citing Bd. of Regents v. Roth, 408 U.S. 564, 569-70 (1972)).

Xcaliber relies on Fuentes v. Shevin, 407 U.S. 67 (1972), and Bell v. Burson, 402 U.S. 535 (1971), to support its argument that the Kansas and Oklahoma escrow statutes effect a prejudgment seizure of its property without providing procedural due process. In Fuentes, the Supreme Court held that state statutes that permitted an individual, upon obtaining ex parte a writ of replevin, to seize another's property without notice to that person or any opportunity for a hearing before its seizure failed to provide due process. See 407 U.S. at 69-70, 96-97. And in Bell, the Supreme Court held that a Georgia statute that suspended an uninsured motorist's vehicle registration and driver's license when that

51

motorist was involved in an accident, unless the motorist first posts security to cover the amount of damages claimed by the aggrieved parties in the accident reports, deprived the uninsured motorist of property without due process. See 402 U.S. at 535-38, 542.

Those cases, however, do not address the same type of statute as the escrow statutes at issue here, as amended by the Allocable Share Amendment. See Texaco, Inc. v. Short, 454 U.S. 516, 536-37 (1982). The statutes at issue in Fuentes and Bell provided for individualized deprivations of property upon the occurrence of specified events. See id. Here, on the other hand, the Kansas and Oklahoma legislatures have determined that NPMs should pay into an escrow fund a specific amount for each cigarette the NPM sells in that state. Plaintiffs, thus, are challenging "the states' legislative, not adjudicative, actions, and official action that is legislative in nature is not subject to the notice and hearing requirements of the due process clause." Pryor, 425 F.3d at 174 (quotation, alteration omitted). Further, the escrow statutes provide "a rule of law uniformly affecting all citizens that establishes the circumstances in which" all NPMs are temporarily deprived of their property.[17] Short, 454 U.S. at 537. Thus, the enactment and publication of the statute provides citizens affected by that statute

_____

[17]Xcaliber protests that the escrow statutes, as amended by the Allocable Share Amendment, do not treat NPMs the same as those manufacturers participating in MSA. But it does, because the amended statute requires all tobacco manufacturers selling cigarettes in that state either to join the MSA or make escrow payments. See S&M Brands, 393 F. Supp. 2d at 634.

52

with adequate notice and due process. See id. at 531-33 (noting that, "[g]enerally, a legislature need do nothing more than enact and publish the law, and afford the citizenry a reasonable opportunity to familiarize itself with its terms and to comply"); see also Atkins v. Parker, 472 U.S. 115, 129-30 (1985) (noting that Congress' legislative enactment changing welfare benefits, in which recipients citizens had a protected property interest, did not deprive those recipients of due process because "the legislative determination provides all the process that is due") (quotation, alteration omitted); Logan v. Zimmerman Brush Co., 455 U.S. 422, 432-33 (1982). This is particularly true in light of the fact that Plaintiffs here are expressly not challenging the original escrow statutes' requirement that they place funds in escrow for twenty-five years, but only the Allocable Share Amendment's change of the amount of escrow funds refunded annually.

Therefore, the Oklahoma district court did not err in dismissing Plaintiffs' procedural due process claims, and the Kansas district court did not err in granting the state summary judgment. See S&M Brands, 393 F. Supp. 2d at 633-35; PTI, 100 F. Supp. 2d at 1208.

### 4. Substantive due process

In its complaint, KT&G alleged only a procedural due process claim, asserting that Oklahoma's escrow statute, as amended by the Allocable Share Amendment, effected a prejudgment seizure of KT&G's property without

53

providing procedural due process. But on appeal, KT&G now argues essentially

that Oklahoma has no good reason to require NPMs to make these escrow

payments. Oklahoma characterizes this as a substantive due process claim.[18] To

the extent that that is the nature of KT&G's argument, KT&G cannot assert such

a claim for the first time on a appeal.

Were we to address the merits of the substantive due process claim,

however, it, too, would fail.

> The Due Process Clause includes a substantive component that provides some protection against economic legislation interfering with property interests. This protection, however, is severely limited. The Supreme Court has long recognized that the day is gone when [the] Court uses the Due Process Clause of the Fourteenth Amendment to strike down state laws, regulatory of business and industry conditions, because they may be unwise, improvident, or out of harmony with a particular school of thought.

> To comport with the limited scope of substantive due process protection, economic legislation need only be rationally related to a legitimate government interest. Under rational basis review, therefore, there is no need for mathematical precision in the fit between justification and means, and the law need not be in every respect logically consistent with its aims to be constitutional. It is enough that there is an evil at hand for correction, and that it might be thought that the particular legislative measure was a rational way to correct it. Moreover, economic legislation comes to the Court with a presumption of constitutionality, and the burden is on one complaining of a due process violation to establish that the legislature has acted in an arbitrary and irrational way. Thus, it is difficult to exaggerate the burden that a party must overcome to demonstrate that economic legislation fails rational basis review.

---

[18]Although KT&G alleged only a procedural due process claim in its complaint, it argued both a procedural and a substantive due process claim to the district court in KT&G's response to Oklahoma's motion to dismiss.

The courts defer to rational legislative decisionmaking with respect to economic legislation because the legislatures are better equipped to consider and evaluate the profound and far reaching consequences that such legislation may have. Thus, the Supreme Court has admonished that it is for the legislature, not the courts, to balance the advantages and disadvantages of economic legislation. This deference is appropriate because the people may resort to the polls to protect themselves against abuses by the legislature.

Star Scientific, 278 F.3d at 348-49 (quotations, citations, alterations omitted).

KT&G has failed to meet its heavy burden. Oklahoma's amended escrow statute is rationally related to the state's legitimate interests in promoting health and insuring the availability of adequate funds to address the state's future tobacco-related health care costs. See Pryor, 425 F.3d at 175; see also Int'l Tobacco Partners, 420 F. Supp. 2d at 1000; Grand River Enters. Six Nations, Ltd., 418 F. Supp. 2d at 1095; Dos Santos, 418 F. Supp. 2d at 1077; S&M Brands, 393 F. Supp. 2d at 630-33; cf. Star Scientific, 278 F.3d at 349-50 (rejecting substantive due process challenge to originally enacted escrow statute).

### 5. Commerce Clause claim

KT&G alleged that Oklahoma's Allocable Share Amendment violated the Commerce Clause and the Supremacy Clause by "imposing a national cost on doing business in the state" of Oklahoma. The Oklahoma district court dismissed this claim for failure to state a claim upon which relief could be granted. See Fed. R. Civ. P. 12(b)(6). KT&G challenges that decision on appeal. We review that decision de novo, accepting KT&G's well-pled allegations as true. See

55

Teigen, 511 F.3d at 1078.

"The Commerce Clause provides that 'Congress shall have Power . . . [t]o regulate Commerce with foreign Nations, and among the several States.'" United Haulers Ass'n, Inc. v. Oneida-Herkimer Solid Waste Mgmt. Auth., 127 S. Ct. 1786, 1792 (2007) (quoting U.S. Const. art. I, § 8, cl. 3). In addition to that express authority, courts have interpreted the Commerce Clause also to restrain state authority implicitly. See id.

> A state statute may violate the dormant Commerce Clause in three ways:
>
> > First, a statute that clearly discriminates against interstate commerce in favor of intrastate commerce is virtually invalid per se and can survive only if the discrimination is demonstrably justified by a valid factor unrelated to economic protectionism. Second, if the statute does not discriminate against interstate commerce, it will nevertheless be invalidated under the Pike v. Bruce Church Inc., 397 U.S. 137, 142 . . . (1970), balancing test if it imposes a burden on interstate commerce incommensurate with the local benefits secured. Third, a statute will be invalid per se if it has the practical effect of extraterritorial control of commerce occurring entirely outside the boundaries of the state in question.

Pryor, 425 F.3d at 168 (quotation, alteration omitted); see also United Haulers, 127 S. Ct. at 1793; Am. Trucking Ass'ns, Inc. v. Mich. Pub. Serv. Comm'n, 545 U.S. 429, 433 (2005). "In this context, 'discrimination' simply means differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." United Haulers, 127 S. Ct. at 1793 (quotation omitted).

56

KT&G argues only that Oklahoma's Allocable Share Amendment impacts commerce occurring entirely outside of Oklahoma.[19]  More specifically, KT&G contends that, because KT&G's escrow obligation in Oklahoma is tied to KT&G's nationwide sales, Oklahoma is able to control cigarette pricing nationally.[20]

But again Oklahoma's amended escrow statute required KT&G to pay into an escrow account annually an amount calculated on the number of cigarettes KT&G sold in Oklahoma in a given year, multiplied by a per-cigarette amount established by the Oklahoma legislature.  While it is true that KT&G's annual escrow payment is capped by the amount it would have had to pay on those Oklahoma sales under the MSA, had it chosen to join the MSA, the Oklahoma Allocable Share Amendment's reliance on the MSA to cap an NPM's annual

---

[19]On appeal, KT&G does not develop an argument under Pike v. Bruce Church, Inc., 397 U.S. 137 (1970), and accordingly we do not address that.

[20]Oklahoma complains that KT&G is, on appeal, asserting a different theory of recovery under the Commerce Clause than it asserted to the district court. Specifically, Oklahoma complains that KT&G has altered its theory of recovery to adopt the theory successfully asserted in Pryor, 425 F.3d at 168, 170-73 (holding dormant Commerce Clause claim, challenging MSA and its escrow statute, was sufficient to survive Rule 12(b)(6) dismissal).  Admittedly, KT&G's commerce clause argument to the district court was vague, and KT&G did not assert this specific argument in defense of Oklahoma's motion to dismiss. Nevertheless, in its complaint, KT&G alleged that "[t]he Allocable Share Amendment imposes a national cost on doing business within the state" of Oklahoma and further asserts that the Amendment "unjustifiably burdens interstate commerce on Non-Participating Manufacturers."  And Oklahoma addressed this issue in its pleadings in support of its Rule 12(b)(6) motion to dismiss.  Under these circumstances, we conclude KT&G sufficiently presented the same theory of recovery to the district court that it now asserts on appeal.

escrow payment in no way allows Oklahoma to control commerce occurring entirely outside Oklahoma.

This is true even though the MSA calculates a manufacturer's annual payments based in part on that manufacturer's national market share for that given year. But that is because the MSA provides a set amount of annual payments that participating manufacturers agree to pay the settling states for a given year. The amount of that annual payment is, thus, divided among the participating manufacturers according to their national market shares, with some additional adjustments. The MSA's reliance on a manufacturer's national market share for a given year does not permit Oklahoma, through its Allocable Share Amendment, to control commerce occurring wholly outside that state.

For this reason, we disagree with the Second Circuit's conclusion in Pryor, 425 F.3d at 171-72, to the contrary. In that case, the Second Circuit accepted as true the NPM's allegation that the challenged MSA statute impacted commerce occurring wholly outside the state. See id. But after considering the language of the statute itself, and reviewing how the statute incorporates the terms of the MSA, we conclude, as a matter of law, that Oklahoma's Allocable Share Amendment does not allow it to control commerce occurring entirely outside Oklahoma.[21]

_____

[21]The Second Circuit's decision in Pryor that an NPM had stated a commerce clause claim sufficient to survive summary judgment was also based,

(continued...)

58

The Oklahoma Allocable Share Amendment to its escrow statute is quite different from the statutes the Supreme Court has invalidated based upon their impact on commerce occurring wholly outside the state. For example, in Edgar v. MITE Corp., 457 U.S. 624 (1982), the Supreme Court invalidated an Illinois statute that required a company to register its take-over bid for a company with connections with Illinois, as further defined by the statute. See id. at 626-27. The Court held that that state statute directly regulated and prevented take-over bids, unless the company pursuing the take-over complied with Illinois' requirements, even if the take-over bid took place entirely outside the state of Illinois. See id. at 641-43. The Supreme Court, therefore, concluded the Illinois statute restrained interstate commerce and had a "sweeping extraterritorial effect." Id. at 641-42. In addition, the Court held that, even if the Illinois statute had only an indirect effect upon interstate commerce, that burden had a nationwide reach that was not justified by Illinois' local interests. See id. at 643-46.

And in Brown-Forman Distillers Corp. v. New York State Liquor Authority, 476 U.S. 573 (1986), the Court invalidated a New York statute that required liquor distillers and producers to sell their products in New York for no

[21](...continued)
in part, on the Second Circuit's conclusion that the NPM's Sherman Act claims also survived Rule 12(b)(6) dismissal. See 425 F.3d at 171-72. But we have already determined, in this action, that the district courts in these cases properly granted the states summary judgment on Plaintiffs' Sherman Act claims.

more than the lowest price the distiller or producer charged for the same product anywhere in the United States. See id. at 575-76. The Court held that this statute permitted the State of New York to regulate liquor prices in other states by making it illegal for the distiller or producer to lower prices in other states after the distiller or producer had declared its price in New York. See id. at 582-84.

The Court struck down a similar Connecticut liquor law in Healy v. Beer Institute, Inc., 491 U.S. 324, 326, 335-41 (1989). The Connecticut statute also required out-of-state beer shippers to affirm that the prices they were charging for their products in Connecticut were no higher than the lowest price charged for the same products in the rest of the United States. See id. at 326.

These statutes that the Supreme Court struck down directly permitted states to impact or control commerce occurring wholly outside that state. In contrast, Oklahoma's Allocable Share Amendment requires NPMs doing business in Oklahoma to make an annual escrow payment, calculated based upon the number of cigarettes that particular NPM sold in Oklahoma in a given year. See Star Scientific, 278 F.3d at 355-56 (addressing escrow statute). Even considering the fact that Oklahoma caps an NPM's annual escrow payment at the amount the NPM would have had to pay that year under the MSA, based upon the same sales in Oklahoma, and the fact that the MSA considers a manufacturer's share of the national market in calculating the manufacturer's annual MSA payment, we cannot conclude that the Allocable Share Amendment permits Oklahoma directly

to impact or control commerce occurring wholly outside that state.

The district court, therefore, did not err in dismissing this Commerce Clause claim.  See Grand River Enters. Six Nations, Ltd., 418 F. Supp. 2d at 1099-1100; Dos Santos, 418 F. Supp. 2d at 1081-82; PTI, 100 F. Supp. 2d at 1200-03; see also Int'l Tobacco Partners, 475 F. Supp. 2d at 1089-92 (granting Kansas summary judgment on Commerce Clause claim challenging Kansas' Allocable Share Amendment); cf. Star Scientific, 278 F.3d at 354-57 (rejecting Commerce Clause challenge to escrow statute).

## III.  CONCLUSION

For the foregoing reasons, we affirm the decisions of both the Kansas and Northern District of Oklahoma courts dismissing Plaintiffs' claims.[22]

---

[22]Plaintiffs' arguments are vague and hard to follow.  To the extent they are attempting to raise other issues not addressed in this opinion, we reject those arguments, deeming them to be inadequately argued or supported.  See Gross, 53 F.3d at 1547; Am. Airlines v. Christensen, 967 F.2d 410, 415 n.8 (10th Cir. 1992).