FILED
United States Court of Appeals
Tenth Circuit

December 19, 2016

Elisabeth A. Shumaker
Clerk of Court

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

JOHNSON & JOHNSON VISION CARE,
INC.; ALCON LABORATORIES, INC.;
BAUSCH & LOMB INCORPORATED,

     Plaintiffs - Appellants,

v.

SEAN D. REYES, in his official capacity
as Attorney General of the State of Utah,

     Defendant - Appellee.

------------------------------

1-800 CONTACTS, INC.; COSTCO
WHOLESALE CORPORATION,

     Intervenors - Appellees.

------------------------------

LD VISION GROUP,

     Amicus Curiae.

Nos. 15-4071, 15-4072 & 15-4073
(D.C. Nos. 2:15-CV-00252-DB,
2:15-CV-00257-DB, 2:15-CV-00259-DB)
(D. Utah)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **HOLMES**, **BACHARACH**, and **PHILLIPS**, Circuit Judges.
_____

---

    [*] This order and judgment is not binding precedent, except under the doctrines
of law of the case, res judicata, and collateral estoppel. It may be cited, however, for
its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

In 2013, three of the nation's four largest contact-lens manufacturers implemented uniform pricing policies (UPPs) to set minimum retail prices for contact-lens sales in all fifty states. In 2015, Utah enacted Utah Code Ann. § 58-16a-905.1, which prohibited manufacturers from enforcing their UPPs against retailers in Utah. In effect, the statute freed retailers in Utah to sell contact lenses at prices lower than the prices manufacturers had set and mandated in their UPPs. In the district court, the manufacturers sought a preliminary injunction to stop Utah from applying section 58-16a-905.1. They argued that this statute violates the Commerce Clause. We affirm the district court's denial of a preliminary injunction.

## BACKGROUND

### 1. The Anticompetitive Nature of the Contact-Lens Industry

Because contact lenses are medical devices, consumers cannot buy them without a valid prescription from an eye-care professional. In the United States, four contact-lens manufacturers control 98.5% of the contact-lens market—Johnson & Johnson Vision Care, Inc.; Alcon Laboratories, Inc.; Bausch & Lomb Incorporated; and CooperVision Inc. The first three companies listed ("Manufacturers") are the plaintiffs in this case. None of the Manufacturers have offices in Utah or manufacture contact lenses there.

The district court found that the contact-lens industry is anticompetitive, partly because eye-care professionals prescribe, and often sell, brand-specific contact-lenses. It noted that "[i]n almost no other medical context does the prescriber of a medical device have the power to control both the brand the patient must use and also

2

sell the particular medical device in the same breath." R. vol. 4 at 759. Compounding this problem, in all states except now in Utah, contact-lens manufacturers by their UPPs set minimum retail sales prices for contact lenses. The UPPs stop retailers from selling contact lenses for less than the UPPs' minimum-required (and artificially high) prices.

Though not always so, consumers now have a right to a copy of their contact-lens prescription, enabling them to buy contact lenses from sellers other than their prescribing eye-care professionals. For instance, with their prescriptions, consumers may now buy their contact-lenses from other retailers, including eye-care retailers (such as LensCrafters), mass-merchandise retailers (such as Costco or Wal-Mart), and Internet retailers (such as 1-800-Contacts or Lens.com).

Because of the industry's anticompetitive leanings, contact-lens manufacturers have faced federal and state legislation challenging their anticompetitive behavior, as well as antitrust lawsuits. For example, in the 1990s, attorneys general from 32 states and a national class of consumers sued Johnson & Johnson, Bausch & Lomb, and CIBA Vision Corporation, alleging that those companies had conspired with eye-care professionals to restrain competition and to protect eye-care professionals from retail competition. *See In re Disposable Contact Lens Litig.*, Nos. 3:00-94 MD 1030, 2001 WL 203964, at *1 (M.D. Fla. Jan. 5, 2001); *In re Disposable Contact Lens Antitrust Litig.*, No. MDL 1030, 2001 WL 493244 (M.D. Fla. Feb. 1, 2001); *In re Disposable Contact Lens Antitrust Litig.*, 170 F.R.D. 524 (M.D. Fla. 1996). In 2001, the parties agreed to "broad injunctive relief requiring the [manufacturers] to sell contact lenses

3

to non-ECP [eye-care professional] retailers in a 'commercially reasonable' and 'non-discriminatory' manner for at least five years." R. vol. 4 at 761.

In 2003, Congress enacted the Fairness to Contact Lens Consumers Act, one provision of which required eye-care professionals to provide patients with their prescriptions. *See* 15 U.S.C. § 7601. The Act aimed to increase retail competition by allowing consumers to buy contact lenses from retailers other than their prescribing eye-care professionals. *Id.* And in 2006, Utah enacted the Contact Lens Consumer Protection Act, which sought to continue the relief afforded by the injunction issued in the *In re Disposable Contact Lens Antitrust Litigation* cases. *See* Utah Code Ann. §§ 58-16a-901–902. To ensure that retailers selling contact lenses to Utah consumers would have an adequate range of supply, the Utah Act required manufacturers to certify that their brands of contact lenses sold in Utah were available in a commercially reasonable and nondiscriminatory manner to different distribution channels. These channels included Internet retailers, mail order companies, department stores, and mass merchandise outlets. *Id.* §§ -902, -904(1).

### 2.     Uniform Pricing Policies

In 2013, the Manufacturers implemented nationwide UPPs, which set minimum retail prices for their contact lenses. Under the UPPs, the Manufacturers reserved a right not to supply contact lenses to any retailer selling at prices below the UPP's minimum prices.

The Manufacturers claim that their UPPs result in lower prices for contact lenses. For instance, Johnson & Johnson claims that the UPPs save contact lens

4

retailers and buyers the trouble of a complex rebate system. Under this rebate system, consumers received rebate forms upon purchase to complete and return for Manufacturer rebates. Johnson & Johnson contends that few consumers took the necessary steps to receive the available rebates.

The Manufacturers also claim that UPPs improve patient care. For example, Johnson & Johnson argues that UPPs allow eye-care professionals to "devote more time to treating patients and less time to monitoring prices and rebates offered by retailers, and the consumer knows there is no need to shop around for a better bargain." Johnson & Johnson Opening Br. at 4. And Alcon argues that UPPs benefit eye-care professionals by advising them "about the attributes of [the] products and of encouraging them, in turn, to inform patients of the product's potential benefits." Alcon Opening Br. at 10. The Manufacturers also tout the UPPs for "eliminat[ing] the need for discussions with eye doctors about other retailers' prices. Consumers are assured that if their [eye-care professional] or any other retailer is charging the minimum price, there is no need to shop around for a better bargain." R. vol. 4 at 762.

In contrast, Costco and 1-800-Contacts argue that UPPs serve to "insulate [eye-care professionals] from retail competition" and encourage eye-care professionals to prescribe a specific brand of contact lenses. Joint Br. of 1-800 Contacts, Inc. and Costco Wholesale Corporation at 7. They claim that UPPs restrict consumers' options and increase prices. They also assert that UPPs benefit eye-care

5

professionals by preventing others—including online retailers like 1-800-Contacts—from competing with lower prices.

### 3. Utah Code Ann. § 58-16a-905.1

In 2015, as mentioned, Utah passed a law preventing Manufacturers from fixing retail contact-lens prices and from discriminating against contact-lens retailers selling lenses below the UPPs' minimum prices:

> A contact lens manufacturer or a contact lens distributor may not:
>
> (1) take any action, by agreement, unilaterally, or otherwise, that has the effect of fixing or otherwise controlling the price that a contact lens retailer charges or advertises for contact lenses; or
>
> (2) discriminate against a contact lens retailer based on whether the contact lens retailer:
>
> > (a) sells or advertises contact lenses for a particular price;
> >
> > (b) operates in a particular channel of trade;
> >
> > (c) is a person authorized by law to prescribe contact lenses; or
> >
> > (d) is associated with a person authorized by law to prescribe contact lenses.

Utah Code Ann. § 58-16a-905.1. The Utah legislature also amended section 58-16a-906 to provide that "[t]he attorney general may bring a civil action or seek an injunction and a civil penalty" against anyone violating section 58-16a-905.1. *Id.* § 58-16a-906(2).

### 4. Present Lawsuit

6

On April 13, 2015, about three weeks before section 58-16a-905.1's effective date,[1] Alcon filed this lawsuit seeking declaratory and injunctive relief against the Utah Attorney General to stop him from enforcing section 58-16a-905.1. In support, it argued that the Utah statute violates the Commerce Clause. Alcon filed a preliminary-injunction motion the same day. The next day, Johnson & Johnson and Bausch & Lomb filed separate lawsuits. The district court consolidated the Manufacturers' lawsuits. On April 17, 2015, 1-800 Contacts and Costco intervened. After a hearing, the district court denied the Manufacturers' request for preliminary injunction, concluding that they had failed to meet any of the necessary showings discussed below.

## STANDARD OF REVIEW

"On appeal, we review a district court's decision to grant a preliminary injunction for abuse of discretion." *Fish v. Kobach*, 840 F.3d 710 (10th Cir. 2016). "An abuse of discretion occurs where a decision is premised 'on an erroneous conclusion of law or where there is no rational basis in the evidence for the ruling.'" *Id.* (quoting *Awad v. Ziriax*, 670 F.3d 1111, 1125 (10th Cir. 2012)). In measuring whether the district court abused its discretion, we review the district court's factual findings for clear error and its conclusions of law de novo. *Id.*

---

[1] We see nothing in the record suggesting that Utah has pursued any enforcement action against any of the Manufacturers. On May 13, 2015, we issued a temporary injunction pending our resolution of this appeal. But on June 12, 2015, after receiving briefing from all parties on whether to grant an injunction pending appeal, we denied the Manufacturers' motion for injunction pending appeal and vacated our temporary injunction. So Utah has enforced section 58-16a-905.1 from June 12, 2015 forward.

**DISCUSSION**

"[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (quoting 11A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2948 (2d ed. 1995)). To obtain a preliminary injunction, the Manufacturers needed to show "(1) a likelihood of success on the merits; (2) a likelihood that the moving party will suffer irreparable harm if the injunction is not granted; (3) the balance of equities is in the moving party's favor; and (4) the preliminary injunction is in the public interest." *Verlo v. Martinez*, 820 F.3d 1113, 1126 (10th Cir. 2016) (quoting *Republican Party of N.M. v. King,* 741 F.3d 1089, 1092 (10th Cir. 2013)). The district court weighs these factors, and we limit our review to abuse of discretion. *Gen. Motors Corp. v. Urban Gorilla, LLC*, 500 F.3d 1222, 1226 (10th Cir. 2007).

### 1. Likelihood of Success on the Merits

The Manufacturers argue that section 58-16a-905.1 violates the Commerce Clause in three ways: (1) it impermissibly discriminates against out-of-state economic interests; (2) it imposes undue burdens on interstate commerce; and (3) it causes impermissible extraterritorial effects. We conclude that the district court didn't abuse its discretion in determining that the Manufacturers are unlikely to succeed on any of these claims.

We presume that sections 58-16a-905.1–906 are constitutional. *See Doe v. City of Albuquerque*, 667 F.3d 1111, 1120 (10th Cir. 2012). And on top of this, we

8

recognize that states may enact their own antitrust laws to supplement federal antitrust laws. "Congress intended the federal antitrust laws to supplement, not displace, state antitrust remedies." *California v. ARC America Corp.*, 490 U.S. 93, 102 (1989). Generally, state laws that deter anticompetitive conduct are consistent with the broad purposes of federal antitrust laws. *Id.* Utah enacted section 58-16a-905.1 with this salutary purpose—to deter the Manufacturers' anticompetitive conduct preventing price competition.

Despite this, the Manufacturers claim that section 58-16a-905.1 violates the Commerce Clause. The Commerce Clause grants Congress power to "regulate Commerce . . . among the several States." U.S. Const. art. I, § 8, cl. 3. In addition to that express authority, the Commerce Clause also implicitly restrains state authority through the dormant Commerce Clause.[2] *KT & G Corp. v. Atty. Gen. of Okla.*, 535 F.3d 1114, 1143 (10th Cir. 2008). Whether a state violates the dormant Commerce Clause depends on whether its law improperly interferes with interstate commerce, primarily for economic protectionism. *Direct Mktg. Ass'n v. Brohl*, 814 F.3d 1129, 1135 (10th Cir. 2016), *petition for cert. filed*, (Sept. 1, 2016) (No. 16-267).

A state statute may violate the dormant Commerce Clause in three ways:

First, a statute that clearly discriminates against interstate commerce in favor of intrastate commerce is virtually invalid *per se* and can survive only if the discrimination is demonstrably justified by a valid factor

---

[2] For many years, the Supreme Court has read the Commerce Clause to include the "dormant" or "negative" Commerce Clause. *Energy and Env't Legal Inst. v. Epel*, 793 F.3d 1169, 1171 (10th Cir. 2015). Using this clause, courts have stricken state laws that unduly interfere with interstate commerce. *Id.*

unrelated to economic protectionism. Second, if the statute does not discriminate against interstate commerce, it will nevertheless be invalidated under the *Pike v. Bruce Church Inc.*, 397 U.S. 137, 142 . . . (1970), balancing test if it imposes a burden on interstate commerce incommensurate with the local benefits secured. Third, a statute will be invalid *per se* if it has the practical effect of extraterritorial control of commerce occurring entirely outside the boundaries of the state in question.

*KT & G Corp.*, 535 F.3d at 1143 (quoting *Grand River Enters. Six Nations, Ltd. v. Pryor*, 425 F.3d 158, 168 (2d Cir. 2005)). We focus our analysis on these recognized dormant Commerce Clause violations. And we conclude that the district court didn't abuse its discretion by holding that the Manufacturers failed to show that they are likely to succeed on the merits of their dormant Commerce Clause claims.[3]

>    **A.    The district court properly exercised its discretion in concluding that section 58-16a-905.1 doesn't discriminate against interstate commerce.**

"State laws discriminating against interstate commerce on their face are virtually *per se* invalid." *Camps Newfound/Owatonna, Inc. v. Town of Harrison*, 520 U.S. 564, 575 (1997) (internal quotations omitted). And discrimination "simply means differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." *KT & G Corp.*, 535 F.3d at 1143 (quoting *United Haulers Ass'n, Inc. v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 550 U.S. 330, 338 (2007)). We look to see whether the state statute "discriminat[es] between transactions on the basis of some interstate element." *Comptroller v. Wynne*, 135 S.

---

[3] We limit our review to the preliminary-injunction standard and recognize that Manufacturers will have an opportunity to show a dormant Commerce Clause violation in further district-court proceedings.

10

Ct. 1787, 1794 (2015) (quoting *Bos. Stock Exch. v. State Tax Comm'n*, 429 U.S. 318, 332 n.12 (1977)).

"The party claiming discrimination must show that the state law benefits local actors and burdens out-of-state actors, and the result must alter the competitive balance between in-state and out-of-state firms." *Direct Mktg. Ass'n*, 814 F.3d at 1142 (internal quotations and alteration omitted). Supreme Court cases reveal how states can impermissibly discriminate against interstate commerce. For instance, in *Oregon Waste System, Inc. v. Department of Environmental Quality*, 511 U.S. 93, 96, 99–100 (1994), the Supreme Court concluded that a state statute discriminated against interstate commerce by imposing a higher surcharge on disposal of solid-waste "generated out-of-state" than the surcharge for solid waste generated in-state. And in *Hughes v. Oklahoma*, 441 U.S. 322, 336–37 (1979), the Supreme Court concluded that a state statute forbidding the transportation of minnows outside of the state for sale discriminated against interstate commerce. In *Wyoming v. Oklahoma*, 502 U.S. 437, 455 (1992), the Supreme Court struck down an Oklahoma statute that reserved a segment of the Oklahoma coal market for Oklahoma-mined coal, to the exclusion of coal mined in other states. Similarly, in *West Lynn Creamery, Inc. v. Healy*, 512 U.S. 186, 193 (1994), the Supreme Court explained that a "paradigmatic example of a law discriminating against interstate commerce is the protective tariff or customs duty, which taxes goods imported from other States, but does not tax similar products produced in State." Finally, in *Healy v. Beer Institute, Inc.,* 491 U.S. 324, 341 (1989), the Supreme Court concluded that a Connecticut statute discriminated

11

against interstate commerce by treating Connecticut and out-of-state beer producers differently. In particular, the statute allowed Connecticut wholesalers not selling in states other than Connecticut to charge any price in Connecticut, while limiting beer producers selling beer outside Connecticut to the price they charged in those other states. *Id.* In each of these cases, the state laws imposed restrictions or burdens on out-of-state or interstate parties to benefit in-state interests.

Here, the Utah statute is easily distinguishable from those offending statutes at issue in the cited cases. The Manufacturers claim that section 58-16a-905.1 violates the dormant Commerce Clause by discriminating against interstate commerce in favor of retailers in Utah. In support, they contend that section 58-16a-905.1 favors retailers in Utah over out-of-state manufacturers by taking away pricing authority from the out-of-state manufacturers and giving it to retailers in Utah. And they claim that section 58-16a-905.1 "impermissibly confers on Utah retailers a special exemption from manufacturers' pricing policies that no other retailers enjoy." Johnson & Johnson Opening Br. at 30. But the Manufacturers cannot identify how section 58-16a-905.1 places burdens on contact-lens sales not involving retailers in Utah.

Unlike the statutes in the above-cited cases, section 58-16a-905.1 doesn't require out-of-state retailers to charge more for contact lenses than retailers charge in Utah. Nor does it burden out-of-state retailers. And the Manufacturers certainly haven't contended that section 58-16a-905.1 diminishes the total interstate sales by Manufacturers. The Manufacturers don't identify any way that section 58-16a-905.1

12

treats in-state retailers differently from out-of-state retailers or would treat in-state manufacturers differently from out-of-state manufacturers. And finally, section 58-16a-905.1 doesn't favor retailers in Utah over interstate retailers. *See Exxon Corp. v. Governor of Maryland*, 437 U.S. 117, 125 (1978) (rejecting Commerce Clause challenge when all dealers were treated the same). Instead, section 58-16a-905.1 treats all retailers in Utah the same, regardless of whether the retailers also sell in other states.

In determining whether a statute discriminates against interstate commerce in favor of intrastate commerce, "[i]t is not necessary to look beyond the text of [the] statute . . . ." *Camps Newfound/Owatonna, Inc.*, 520 U.S. at 575. Here, we agree with the district court that section 58-16a-905.1 solely governs the prices contact-lens retailers selling in Utah can charge. The district court didn't err in relying on the Utah Attorney General's interpretation of sections 58-16a-905.1 or 58-16a-906—saying that the statutes don't apply to the conduct of manufacturers or retailers selling outside Utah. If retailers or eye-care professionals selling contact lenses outside of Utah can't compete with the lower price available from retailers in Utah, that's not Utah's fault. Section 58-16a-905.1 doesn't require retailers in other states to sell at higher prices—it doesn't address retailers in other states at all. Nor does the Utah statute somehow restrict other states from following its lead. The Commerce Clause gives neither the Manufacturers nor retailers selling contact lenses outside Utah grounds to repeal Utah's law governing business in Utah.

Alcon also argues that section 58-16a-905.1 necessarily discriminates against out-of-state manufacturers because all manufacturers are located outside of Utah. In *Exxon Corp*, 437 U.S. 117, the Supreme Court rejected a similar argument. There, the Court addressed a Commerce Clause challenge concerning a Maryland statute prohibiting producers or refiners of petroleum from operating any retail service stations in Maryland. *Id.* at 120–21. All petroleum producers and refiners were located outside of Maryland so the statute affected only out-of-state producers and refiners. *Id.* at 125. In rejecting the producers and refiners' arguments, the Court explained that the statute "creates no barriers . . . against interstate independent dealers; it does not prohibit the flow of interstate goods, place added costs upon them, or distinguish between in-state and out-of-state companies in the retail market." *Id.* at 126. The Court observed that "[s]ince Maryland's entire gasoline supply flows in interstate commerce and since there are no local producers or refiners, such claims of disparate treatment between interstate and local commerce would be meritless." *Id.* at 125.

Here, similar to the situation with the petroleum producers and refiners in *Exxon*, all the contact-lens manufacturers are located outside of Utah. Thus, section 58-16a-905.1 cannot favor manufacturers in Utah over out-of-state manufacturers. Instead, "since there are no local [manufacturers], such claims of disparate treatment . . . would be meritless." *Id.* For these reasons, the district court didn't abuse its discretion in concluding that the Manufacturers were unlikely to succeed on the merits of their claim alleging discrimination against interstate commerce.

14

**B.** **The district court properly exercised its discretion in concluding that section 58-16a-905.1 doesn't impose an undue burden on interstate commerce.**

"Whether a state law unduly burdens interstate commerce is a separate inquiry from whether a state law discriminates against interstate commerce." *Direct Mktg. Ass'n*, 814 F.3d at 1145. "A state law that does not discriminate against interstate commerce may still be invalidated under the dormant Commerce Clause if it puts a burden on interstate commerce that is 'clearly excessive in relation to the putative local benefits.'" *Quik Payday, Inc. v. Stork*, 549 F.3d 1302, 1309 (10th Cir. 2008) (quoting *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970)). In determining whether the burden is clearly excessive in relation to the putative local benefits, we apply the *Pike* balancing test. *Kleinsmith v. Shurtleff*, 571 F.3d 1033, 1040 (10th Cir. 2009). The *Pike* balancing test requires us to consider four factors:

> (1) the nature of the putative local benefits advanced by the [statute]; (2) the burden the [statute] imposes on interstate commerce; (3) whether the burden is "clearly excessive in relation to" the local benefits; and (4) whether the local interests can be promoted as well with a lesser impact on interstate commerce.

*Blue Circle Cement, Inc. v. Bd. of Cty. Comm'rs of Rogers*, 27 F.3d 1499, 1512 (10th Cir. 1994) (quoting *Pike*, 391 U.S. at 142). The Manufacturers bear the burden of establishing that section 58-16a-905.1 fails the *Pike* balancing test. *See Kleinsmith*, 571 F.3d at 1043 ("The person challenging the statute bears the burden of establishing a *Pike* violation."). In reviewing the district court's analysis, we review the district court's factual findings for clear error. *Fish*, 840 F.3d 710.

15

Here, the district court identifies two putative local benefits of section 58-16a-905.1: (1) it returns intrabrand competition to the contact-lens market in Utah; and (2) it allows retailers in Utah to charge lower prices to consumers buying contact-lenses in Utah. The district court concluded that the Manufacturers' burden to comply with section 58-16a-905.1 was in line with the burden imposed by other state antitrust laws. Balancing the *Pike* factors, the district court concluded that the Manufacturers were unlikely to succeed on the merits of their claims.

The Manufacturers claim that section 58-16a-905.1 burdens interstate commerce by "interfer[ing] with the manufacturers' pricing policies as they apply to retail sales . . . in all 50 states." Alcon Opening Br. at 47. "Although evidence regarding a particular company may be suggestive, the benefit-to-burden calculation is based on the overall benefits and burdens that the statutory provision may create, not on the benefits and burdens with respect to a particular company or transaction." *Quik Payday, Inc.*, 549 F.3d at 1309. So we focus our analysis on the overall putative local benefits and the burdens on interstate commerce, rather than the Manufacturers' specific burdens.

The record supports the district court's factual findings concerning the local benefits and burdens of section 58-16a-905.1. Thus, we see no clear error. And we agree with the district court that the Manufacturers haven't shown that any burden clearly exceeded the local benefits. Again, in *Exxon*, the Supreme Court addressed similar arguments that the Maryland law burdened interstate companies by

16

disallowing interstate producers and refiners from operating service stations in Maryland. 437 U.S. at 127. The Supreme Court rejected this argument in these terms:

> Some refiners may choose to withdraw entirely from the Maryland market, but there is no reason to assume that their share of the entire supply will not be promptly replaced by other interstate refiners. The source of the consumers' supply may switch from company-operated stations to independent dealers, but interstate commerce is not subjected to an impermissible burden simply because an otherwise valid regulation causes some business to shift from one interstate supplier to another.

*Id.* The same analysis applies in our case. The Manufacturers have presented no evidence that section 58-16a-905.1 will reduce the nationwide total sales of contact lenses. In fact, a basic law of economics tells us that increased sales follow lower prices. So following the Supreme Court's reasoning in *Exxon*, we conclude that section 58-16a-905.1 doesn't impose an undue burden on interstate commerce.

### C. The district court didn't err in concluding that section 58-16a-905.1 will have no impermissible extraterritorial effects.

"[T]he 'Commerce Clause . . . precludes the application of a state statute to commerce that takes place wholly outside of the State's borders, whether or not the commerce has effects within the State.'" *Healy*, 491 U.S. at 336 (quoting *Edgar v. MITE Corp.*, 457 U.S. 624, 642–43 (1982)). Under this rule, "a State may not adopt legislation that has the practical effect of establishing 'a scale of prices for use in other states.'"[4] *Id.* (quoting *Baldwin v. G.A.F. Seelig, Inc.*, 294 U.S. 511, 528 (1935)).

---

[4] In *Healy*, Connecticut learned that beer prices were consistently lower in three bordering states than in Connecticut. *Id.* at 326. This led to Connecticut residents frequently crossing state lines to purchase beer. *Id.* To eliminate the price difference, Connecticut enacted a statute requiring out-of-state beer shippers to

The district court concluded that section 58-16a-905.1 has no extraterritorial application, that is, it will not apply to sales occurring outside of Utah. The Manufacturers claim that section 58-16a-905.1 has impermissible extraterritorial effects because all of the manufacturers are located outside of Utah, and because it regulates sales of contact lenses to consumers outside of Utah.[5]

Utah's section 58-16a-905.1 doesn't require other states to do anything. They can choose whether to pass similar statutes. Section 58-16a-905.1 reaches no further than contact-lens sales in Utah. When interpreting section 58-16a-905.1, we are guided by the rule of constitutional avoidance. *Doe*, 667 F.3d at 1120. The district court correctly pointed out that "[u]nder a deeply rooted and longstanding canon of construction, statutes are presumed not to have extraterritorial effect . . . . [U]nless a statute gives a 'clear indication of an extraterritorial application, it has none.'" R. vol. 4 at 766–67 (quoting *Nevares v. M.L.S.*, 345 P.3d 719, 727 (Utah 2015)). Here,

affirm that their posted prices for products sold to Connecticut wholesale were no higher than the prices sold in the bordering states. *Id.* The Supreme Court concluded that "the Connecticut statute has the undeniable effect of controlling commercial activity occurring wholly outside the boundary of the State" because once a beer shipper sets its price in Connecticut, it cannot change its price in another neighboring state. *Id.* at 337. So in effect, the statute controlled prices in Massachusetts. *See id.* at 326–27. Here, the Manufacturers don't argue that section 58-16a-905.1 controls prices in other states, nor could they. The Manufacturers are free to charge whatever price they choose in other states without violating section 58-16a-905.1.

[5] The Manufacturers also argue that section 58-16a-905.1 violates the dormant Commerce Clause because it directly regulates interstate commerce. But we have recognized that absent a "regulation . . . blatantly regulating price and discriminating against out-of-state consumers or producers, *Baldwin*'s near *per se* rule doesn't apply." *Energy and Env't Legal Inst.*, 793 F.3d at 1173–74.

18

nothing in section 58-16a-905.1 provides for extraterritorial application. So we interpret this statute as though it doesn't apply to retail sales made outside of Utah.

As the district court concluded, relying on the Utah Attorney General's interpretation, neither section 58-16a-905.1 nor 58-16a-906 regulate the price retailers charge for contact lenses outside of Utah.[6] Retailers outside of Utah are free to sell contact lenses for whatever price they would like, including the prices set by the Manufacturers' UPPs.

The Manufacturers also claim that section 58-16a-905.1 has extraterritorial effects because it "bars an out-of-state contact lens manufacturer from setting a minimum resale price for the sale of its products by a Utah contact lens retailer to a customer in California." Alcon Opening Br. at 30. But the Manufacturers' argument ignores Utah's interest. Specifically, the Manufacturers ignore the location of the retailer—Utah. Based on their own analysis, section 58-16a-905.1 doesn't regulate conduct occurring wholly outside of Utah—it only regulates sales from a Utah retailer that is located within Utah.[7]

---

[6] For example, section 58-16a-905.1 doesn't regulate sales by Colorado retailers that occur in Colorado.

[7] Under Utah Code Ann. § 70A-2-401(2)(a), title of the goods passes to the buyer at the time and place of the shipment. So if an out-of-state consumer purchases from retailers in Utah, we conclude that Utah possesses a sufficient interest to regulate the sale from retailers in Utah. *See Okla. Tax Comm'n v. Jefferson Lines, Inc.*, 514 U.S. 175, 184 (1995) (bus-ticket sale from Oklahoma to another state has sufficient nexus to Oklahoma under dormant Commerce Clause). This remains so even though the contact lenses are sent to consumers outside of Utah.

We recently explained that to strike down a statute based on its extraterritorial application, a challenger must establish that the statute has three characteristics: "(1) a price control or price affirmation regulation, (2) linking in-state prices to those charged elsewhere, with (3) the effect of raising costs for out-of-state consumers or rival businesses." *Energy and Env't Legal Inst.*, 793 F.3d at 1173.

Here, section 58-16a-905.1 doesn't have these three characteristics. First, unlike the laws involved in several Supreme Court cases on this point, section 58-16a-905.1 isn't a price control or price affirmation regulation. As examples of cases involving these disallowed regulations, we first point to *Baldwin*, where New York prohibited out-of-state companies from selling milk in the state unless they purchased their milk at the same price paid to New York dairy farmers. 294 U.S. at 519. And in *Brown-Forman Distillers Corp.*, New York law required liquor merchants to list their prices monthly and to affirm that their New York prices were no higher than those charged in other states. 476 U.S. at 576. In both of these cases, the Supreme Court concluded that the state laws required price affirmation. By contrast, Utah's section 58-16a-905.1 requires no price affirmation. In fact, the statute doesn't even control the price of contact lenses sold in Utah. Nothing in section 58-16a-905.1 prevents Manufacturers from selling contact lenses to retailers at whatever price they choose, so long as they don't discriminate against retailers for selling at prices below those set by the Manufacturers. So we agree with the district court that the Manufacturers likely cannot establish that the Utah statute is a price control or price affirmation regulation.

Nor does section 58-16a-905.1 link retail prices charged in Utah to prices charged elsewhere. In contrast to *Baldwin* and *Brown-Forman Distillers Corp.*, where the statutes linked the local prices of goods to prices listed in other states, section 58-16a-905.1 contains no such provision. Again, the Manufacturers and all retailers outside of Utah can sell contact lenses at whatever price they choose. And finally, section 58-16a-905.1 doesn't raise contact-lens prices for consumers buying contact lenses from retailers outside Utah. None of the Manufacturers argue otherwise. Thus, we conclude that the district court properly exercised its discretion in concluding that section 58-16a-905.1 doesn't have impermissible extraterritorial effects.

Because we conclude that the district court didn't abuse its discretion in concluding that the Manufacturers are unlikely to succeed on the merits of their claims, it is unnecessary to address the remaining factors of the preliminary injunction standard. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 23–24 (2008); *Sierra Club, Inc. v. Bostick*, 539 F. App'x 885, 888 (10th Cir. 2013) ("A party seeking a preliminary injunction must prove that *all four* of the equitable factors weigh in its favor.").

## CONCLUSION

The district court's decision denying the Manufacturers' motions for preliminary injunction is affirmed. Because the record before us is limited, we note

21

specifically that we express no opinion on the ultimate merits of this case.

Entered for the Court


Gregory A. Phillips
Circuit Judge

Johnson & Johnson Vision Care v. Reyes, Nos. 15-4071, 15-4072, 15-4073
**BACHARACH**, J., dissenting on Part 1(A).

I respectfully dissent on Part 1(A), where the majority concludes that the manufacturers are unlikely to prevail on their discrimination claim. The threshold procedural question is whether we can entertain the contact-lens manufacturers' as-applied challenge before Utah has enforced the statute. I believe that we can.

The subsequent question is whether the Utah statute violates the dormant commerce clause by discriminating against retailers outside of Utah. In my view, the Utah statute does so. Because of the discrimination against out-of-state retailers, we can uphold the Utah statute only if it survives strict scrutiny.

The district court failed to apply strict scrutiny based on a belief that the statute did not discriminate against out-of-state retailers. In my view, this belief was mistaken; as a result, I would reverse and remand for the district court to apply strict scrutiny when analyzing likelihood of success on the discrimination claim.

## I. The Procedural Validity of the Manufacturers' As-Applied Challenge

Utah questions whether we can consider an injunction because the claim involves application of a statute before it has been enforced. I would hold that the manufacturers can bring an as-applied challenge prior to enforcement.

Relying on *United States v. Gaudreau*, 860 F.2d 357 (10th Cir. 1988), Utah argues that the manufacturers could not bring this challenge until the statute is enforced. *See Gaudreau*, 860 F.2d at 360-61 ("In a declaratory judgment action no one has been charged so the court cannot evaluate the statute as applied."). But after we decided *Gaudreau*, the Supreme Court has entertained multiple as-applied challenges prior to enforcement. *See Gonzales v. Carhart*, 550 U.S. 124, 167 (2007) (abortion); *Wis. Right to Life, Inc. v. Fed. Election Comm'n*, 546 U.S. 410, 411-41 (2006) (per curiam) (First Amendment); *see also Fed. Election Comm'n v. Wis. Right to Life, Inc.*, 551 U.S. 449, 481 (2007) ("[W]e hold that BCRA § 203 is unconstitutional as applied to WRTL's 'Wedding,' 'Loan,' and 'Waiting' ads."); *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 331 (2010) (implicitly approving of as-applied, pre-enforcement challenges). Under these post-*Gaudreau* decisions, the manufacturers can bring an as-applied challenge to the Utah statute prior to enforcement.

## II. The Practical Effect of the Statute on Retailers Selling Contact Lenses

The district court denied a preliminary injunction based largely on a prediction that the manufacturers could not prove their claims at trial. At oral argument, Utah conceded that we engage in de novo review on likelihood of success. I agree with this concession in determining whether

2

the district court correctly applied the law on the manufacturers' claim of discrimination against out-of-state retailers.[1] On this claim, I believe that the district court erred.

## A. How We Gauge Discrimination

The threshold issue involves how we gauge discrimination: Do we restrict ourselves to the text of the Utah statute, or do we go beyond the statutory text to consider the statute's practical effect? The majority concludes that we should confine ourselves to the text of the statute. Maj. Op. at 13. I respectfully disagree.

The Supreme Court has directed us to determine whether the statute "discriminates against interstate commerce either on its face or in practical effect." *Hughes v. Oklahoma*, 441 U.S. 322, 336 (1979). Even neutrally worded statutes may violate the dormant commerce clause when the effect is discriminatory. *Hunt v. Wash. Apple Advert. Comm'n*, 432 U.S. 333, 352-53 (1977); *see also C&A Carbone, Inc. v. Town of Clarkstown*, 511 U.S. 383, 394-95 (1994) (holding that a neutrally worded ordinance violated the dormant commerce clause because the effect was discriminatory).

---

[1] Generally, the abuse-of-discretion standard applies on likelihood of success. *Verlo v. Martinez*, 820 F.3d 1113, 1128 (10th Cir. 2016). But even when the overarching standard is abuse of discretion, we engage in de novo review on matters of law. *Fish v. Kobach*, 840 F.3d 710, 723 (10th Cir. 2016). A matter of law arises on the validity of the manufacturers' claim under the dormant commerce clause. *See Jones v. Gale*, 470 F.3d 1261, 1267 (8th Cir. 2006).

3

The majority confines its inquiry to the statutory text based on *Camps Newfound/Owatonna, Inc. v. Town of Harrison*, 520 U.S. 564 (1997). There, the Supreme Court held that the statutory text facially discriminated against interstate commerce. 520 U.S. at 575-76. Thus, the Court said that it was unnecessary to go beyond the statutory text. *Id.*

In my view, this is true only when the statutory text expressly discriminates against interstate commerce. When the statute is neutrally worded, however, the Supreme Court requires us to go further, examining the statute's practical effect. *Maine v. Taylor*, 477 U.S. 131, 138 (1986); *see also Kleinsmith v. Shurtleff*, 571 F.3d 1033, 1040 (10th Cir. 2009) (stating that the claimant can prevail under the dormant commerce clause by showing that a facially neutral state statute "discriminates in practical effect").

I would follow this requirement. Like the majority, I regard the statute as neutrally worded. As a result, I would consider the statute's practical effect.

**B.    The Utah Attorney General's Interpretation of the Statute**

The Utah attorney general interprets the statute to apply only to Utah retailers. This interpretation is not binding,[2] but it does provide persuasive

---

[2]    *See Stenberg v. Carhart*, 530 U.S. 914, 917 (2000) ("[T]he Court's precedent warns against accepting as 'authoritative' an Attorney General's interpretation of state law where, as here, that interpretation does not bind the state courts or local law enforcement.").

evidence on how the statute will be applied. *See Grayned v. City of Rockford*, 408 U.S. 104, 110 (1972) (interpreting a statute based, in part, on the "interpretation of the statute given by those charged with enforcing it"). Under this interpretation, the manufacturers could not enforce their minimum-pricing policies against Utah contact-lens retailers but could enforce the policies against retailers in every other state.

## C.     The Price Advantage Created by the Statute for Utah Retailers

This interpretation treats similarly situated retailers differently. A retailer in Utah could freely price contact lenses without constraints imposed by any manufacturer. Retailers in the 49 other states could obtain this pricing protection only by relocating to Utah. Unless non-Utah retailers relocate to Utah, they would lack any power to match a Utah retailer's prices anywhere in the country.[3]

---

[3]     The plaintiffs are manufacturers, not retailers. Thus, a potential issue exists regarding the manufacturers' prudential standing to assert the rights of retailers. Prudentially, we generally require plaintiffs to assert their own rights rather than those of third parties. *Warth v. Seldin*, 422 U.S. 490, 499 (1975). But this requirement is prudential, not jurisdictional. *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 804 (1985). As a result, we can decline to consider prudential standing issues when they are not raised by the parties. *See Grubbs v. Bailes*, 445 F.3d 1275, 1281 (10th Cir. 2006) ("Questions relating to *prudential* standing . . . may be pretermitted in favor of a straightforward disposition on the merits.").

In this appeal, no one has questioned the manufacturers' prudential standing to assert the rights of out-of-state retailers. In the absence of adversarial briefing, I would decline to address the potential issue on prudential standing. *See Finstuen v. Crutcher*, 496 F.3d 1139, 1147 (10th

Suppose the four out-of-state manufacturers offer a contact lens to retailers for $5.00 to $10.00.



Now, the retailers will want to resell the contact lenses to consumers throughout the country. Utah has one retailer, 1-800 CONTACTS.[4] Under the Utah law, 1-800 CONTACTS can resell the contact lenses to consumers around the country at any price. But all of 1-800 CONTACTS's competitors are outside Utah, so they will be subject to the manufacturers' price floors.

Cir. 2007) (stating that we could decline to address a newly submitted argument involving prudential standing).

[4]    Costco also ships from Utah, suggesting that it may also be able to use the Utah statute to undersell all retailers outside of Utah.

For illustration, let's assume that the price floor is $25.00. 1-800 CONTACTS could offer the contact lenses at $15.00, underselling all of its out-of-state competitors, who would have to price the contact lenses at $25.00 or more.



The Supreme Court squarely invalidated this sort of discrimination in *Granholm v. Heald*, 544 U.S. 460 (2005). That case involved differences in the treatment of wineries in New York and Michigan. *Granholm*, 544 U.S.

at 467, 476. In both states, the distribution of alcoholic beverages followed a three-tier system, requiring separate licenses for production, wholesale, and retail. *Id.* at 466. But both states enacted regulations that permitted in-state wineries to bypass this system, allowing them to ship products directly to in-state consumers. Out-of-state wineries could not obtain the same benefit. *Id.* at 469-71. This practice violated the dormant commerce clause: The regulations lowered the price of in-state wine relative to out-of-state wine, resulting in discrimination. Out-of-state wineries could obtain equal treatment only by relocating to New York or Michigan. *Id.* at 473-76, 487-88. As a result, the Court held that the regulations discriminated against out-of-state retailers. *Id.* at 487-88, 493.

The same is true here. Under the Utah statute, contact-lens retailers would enjoy price protection inside Utah but not inside any of the other 49 states. This potential exists partly because Utah hosts a retailer, 1-800 CONTACTS, which sells roughly 99% of its contact lenses outside of Utah. The Utah statute allows 1-800 CONTACTS to *always* undersell retailers outside of Utah when competing for sales in 49 states. In my view, the Supreme Court outlawed this sort of discrimination in *Granholm*.

The intervenors ignore this discrimination, focusing instead on the equality enjoyed by manufacturers both inside and outside Utah. I agree with the intervenors that manufacturers are treated equally, but retailers are not. The Utah statute enables a Utah retailer to enjoy price protections

8

that are not enjoyed by retailers in other states (even when competing for sales outside Utah).

**D.     Violation of the Dormant Commerce Clause by Combining an Industry's Organization with the Effect of a State Statute**

Utah acknowledges the difference in treatment of retailers but attributes the ill effects to the manufacturers' pricing policies, rather than the state statute. In reality, however, the discriminatory effects are created by a combination of three factors:

1.     The Utah statute protects Utah retailers from manufacturers' policies setting minimum prices.

2.     The manufacturers have established minimum-pricing programs for all retailers nationwide.

3.     Utah retailers can now undersell retailers in every state when competing for sales in 49 states.

Considered alone, the manufacturers' pricing policies would treat all retailers in the same way. But Utah retailers gain a competitive edge from a combination of the Utah statute and the manufacturers' pricing policies.

Utah and the intervenors argue that retailers outside Utah will be hurt only because of the manufacturers' pricing policies. As Utah and the intervenors contend, the manufacturers can relieve non-Utah retailers of their selling disadvantage by repealing the pricing policies. But in virtually any case, businesses can avoid discriminatory statutes by modifying their policies. That opportunity does not negate the discriminatory nature of the state statute.

9

The Supreme Court addressed analogous issues involving

- the labeling of superior grade apples in *Hunt v. Washington State Apple Advertising Commission*, 432 U.S. 333 (1977);

- the packaging and shipment of high-quality cantaloupes in *Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970);

- the regulation of the shrimp industry in *Toomer v. Witsell*, 334 U.S. 385 (1948), and *Foster-Fountain Packing Co. v. Haydel*, 278 U.S. 1 (1928); and

- the establishment of a federal agency's minimum-pricing scheme in *West Lynn Creamery, Inc. v. Healy*, 512 U.S. 186 (1994).

In *Hunt*, North Carolina adopted a regulation that had prohibited labeling of apples with anything other than a grade adopted by the United States Department of Agriculture. This regulation affected a program in the State of Washington that required stringent inspections. 432 U.S. at 336. North Carolina created a "leveling effect," which the Supreme Court found had discriminated against interstate commerce: Out-of-state apple growers had to change their marketing strategies to comply with a North Carolina statute on labeling. *Id.* at 351-52. The Court noted that "the increased costs imposed by the statute would tend to shield the local apple industry from the competition of [out-of-state] apple growers." *Id.* at 351.

Of course, Washington apple growers could avoid the cost increases by modifying their marketing strategies. But the apple growers didn't have to. The Supreme Court struck down the regulation because the out-of-state

apple growers would experience discriminatory price increases if they continued their existing marketing practices.

Here, out-of-state retailers will be unable to match Utah retailers' prices unless the out-of-state retailers modify their existing marketing practices. Washington apple growers didn't have to modify their marketing practices in *Hunt*, and out-of-state contact-lens manufacturers should not have to do so in our case.

The Supreme Court also addressed similar circumstances in *Pike*. There, Arizona enacted a statute that required all cantaloupes grown in Arizona to be packaged and shipped in a standard format. 397 U.S. at 138. Under authority granted by the statute, an Arizona state official issued an order prohibiting a farmer from transporting its Arizona-grown cantaloupes—which were considered "higher quality" than other Arizonan cantaloupes—to California for packing and processing. *Id.* at 138-39. To comply with the order, the farmer would have had to build packing facilities in Arizona. *Id.* at 140. The Supreme Court invalidated the order as violating the dormant commerce clause, in part because the order had imposed a "straitjacket" on farmers with respect to the allocation of their interstate resources. *Id.* at 146.

In itself, the Arizona order would not have violated the dormant commerce clause. But the Supreme Court considered the impact of the order based on how farmers structured their businesses. The farmers didn't

11

have to restructure their businesses in the face of the Arizona order, and the contact-lens manufacturers should not have to restructure their businesses in the face of Utah's statute.

The circumstances were also similar in *Foster-Fountain Packing* and *Toomer*, where the Supreme Court struck down state laws that interfered with the interstate shrimp industry.

In *Foster-Fountain Packing*, a Louisiana law prohibited interstate shipment of shrimp when "the heads and hulls [had] not been removed." 278 U.S. at 8. This law proved discriminatory only because of the way that the shrimp industry was structured: Shrimp were caught in Louisiana waters and processed and canned for interstate shipment in Mississippi. But virtually all shrimp that left Louisiana had their "heads and hulls" intact. *Id.* at 9-10. Thus, the statute effectively eliminated the shrimp supply for the Mississippi canners. As a result, the Supreme Court struck down the statute under the dormant commerce clause. *Id.* at 13.

And in *Toomer*, a South Carolina statute required shrimp boaters to unload, pack, and ship all shrimp caught in South Carolina waters at a South Carolina port. 334 U.S. at 390-91. Nonetheless, Georgia fishermen would suffer prohibitive costs because they maintained their own docking and packing facilities in Georgia. *Id.* at 403-04. Thus, the Supreme Court struck down the statute. *Id.* at 406.

12

The Supreme Court did not force the Mississippi shrimp canners in *Foster-Fountain Packing* to move to Louisiana, just as the Court did not force the Georgia fishermen to acquire South Carolina docking facilities in *Toomer*. Similarly, the contact-lens manufacturers should not have to adjust their policies to avoid the discriminatory effect of the Utah statute.

The Supreme Court also applied this approach to a minimum-pricing program in *West Lynn Creamery*. There, Massachusetts imposed a pricing order that had the net effect of making milk produced in other states more expensive than milk produced in Massachusetts. 512 U.S. at 194-95, 195 n.10. Producers in other states were handicapped by the pricing order and the minimum prices imposed by a federal agency. *Id.* at 188-89, 194-95. The Supreme Court regarded the Massachusetts scheme as discriminatory even though the dealers' dilemma stemmed from a minimum-pricing scheme enacted by a federal agency. *Id.* at 194-95. The Court explained: "If there were no federal minimum prices . . . , out-of-state producers might still be able to retain their market share by lowering their prices." *Id.* at 195.

Under the argument pressed by Utah and the intervenors, the discriminatory effect in *West Lynn Creamery* would have been caused by the federal agency's minimum-pricing program, rather than by the Massachusetts pricing order. But the Supreme Court did not see it that way. Instead, the Court found discrimination based on the market realities

13

faced by out-of-state dealers in a federal system mandating minimum prices.

We should do the same here. Retailers outside Utah will be unable to match prices with Utah retailers, just as out-of-state dealers in *West Lynn Creamery* could not effectively compete with dealers inside Massachusetts. In both cases, the constraints resulted from a third party's requirement of minimum pricing.[5] In my view, there is no principled basis to find discrimination against interstate commerce in *West Lynn Creamery* and not here.

### E.     The Manufacturers' Ability to Discontinue Sales in Utah

The manufacturers can avoid this discrimination at the retail level only by abandoning sales in Utah. But the manufacturers should not have to abandon sales within Utah solely to retain equal treatment for retailers.

The Supreme Court addressed a similar issue in *City of Philadelphia v. New Jersey*, 437 U.S. 617 (1978). There, the Court confronted a New Jersey statute that prevented entities from bringing trash into New Jersey, holding that the statute discriminated based on the trash's origin. 437 U.S. at 626-27. Companies could avoid the statute's harsh effects by leaving the New Jersey market and shipping trash to other states instead. But the companies did not have to leave New Jersey. And the contact-lens

---

[5]     The legality of the manufacturers' minimum-pricing policies is not at issue.

14

manufacturers should not have to stop doing business with Utah-based retailers.

Utah disagrees, pointing to *Exxon Corporation v. Governor of Maryland*, 437 U.S. 117 (1978). In *Exxon*, the Supreme Court upheld a Maryland statute, in part because "[s]ome refiners may choose to withdraw entirely from the Maryland market, but there is no reason to assume that their share of the entire supply [would] not be promptly replaced by other interstate refiners." *Id.* at 127. The Court concluded that the Maryland statute would not curtail access to interstate gasoline refinery markets.

The contact-lens market is different. Contact-lens prescriptions are brand-specific; thus, if one of the contact-lens manufacturers left Utah, Utah retailers would be completely foreclosed from fulfilling prescription orders for that manufacturer's prescriptions, limiting consumers' access to certain contact lenses. Unlike gasoline, a fungible good, brand-specific contact lenses are unique goods that cannot be "promptly replaced" by another manufacturer when one manufacturer exits a market.

Some courts have relied on *Exxon* in upholding restrictions on interstate commerce. In each case, however, the courts noted that the restriction would cause commerce to *shift* among competitors, not *reduce* commerce. *See, e.g.*, *Yakima Valley Mem'l Hosp. v. Wash. State Dep't of Health*, 731 F.3d 843, 847 (9th Cir. 2013) ("What is really at issue is the shifting of business from one competitor to another, not a burden on

15

interstate commerce."); *Nat'l Ass'n of Optometrists & Opticians v. Harris*, 682 F.3d 1144, 1153 (9th Cir. 2012) ("[T]he *Exxon* Court's decision turned on the interstate *flow of goods . . . .*"); *Wood Marine Serv., Inc. v. City of Harahan*, 858 F.2d 1061, 1065 (5th Cir. 1988) (explaining that a city ordinance did not reduce the amount of commercial material brought into Louisiana and upholding the ordinance in response to a dormant commerce clause challenge); *Am. Motors Sales Corp. v. Div. of Motor Vehicles of Commonwealth of Va.*, 592 F.2d 219, 223 (4th Cir. 1979) (concluding that a statute that "affect[s] the structure of [a] retail market by shifting business from one out-of-state manufacturer to another" does not run afoul of the dormant commerce clause). Utah's statute is different: It may *eliminate* interstate commerce. Therefore, *Exxon*'s logic does not apply here.[6]

\* \* \*

For these reasons, I respectfully disagree with the majority. The statute, as interpreted by the attorney general, discriminates between non-Utah and Utah retailers.

Because of this discrimination, the district court should have upheld the statute only if it survived the "strictest scrutiny" of a legitimate local

---

[6]     *Exxon* also did not involve discrimination against out-of-state retailers. *See Exxon Corp.*, 437 U.S. at 126 (noting that the state statute at issue did not "distinguish between in-state and out-of-state companies in the retail market").

purpose and the absence of nondiscriminatory alternatives. *Camps Newfound/Owatonna, Inc. v. Town of Harrison*, 520 U.S. 564, 581 (1997). The district court did not apply the "strictest scrutiny" to the statute, and Utah does not address whether the statute would survive this level of scrutiny. Without briefing on this issue, I would reverse and remand for the district court to apply strict scrutiny in the first instance.[7] Until the district court does so, it cannot properly assess the manufacturers' likelihood of success on the merits for the claim involving discrimination against out-of-state retailers.

## III. The Remaining Preliminary Injunction Factors

The district court relied heavily on its mistaken view of the manufacturers' likelihood of success. *Alcon Labs., Inc. v. Reyes*, No. 2:15-cv-00252-DB, at *16-18 (D. Utah May 11, 2015). This mistake colored the district court's assessment of the other elements for a preliminary injunction (irreparable injury, balancing of the equities, and the public interest). *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

We do not know how the district court would have ruled if it had correctly assessed the manufacturers' likelihood of success. *See Lawson Prods., Inc. v. Avnet, Inc.*, 782 F.2d 1429, 1437-38 (7th Cir. 1986) (noting how the "cold record" before an appellate court precludes a full "sense of

---

[7] The parties do not address whether Utah has waived an argument that the statute would survive under strict scrutiny. I would leave the issue of a potential waiver to the district court on remand.

17

the equities or the merits of a case" to grant a preliminary injunction).

Thus, I believe that we should reverse and remand for the district court to reconsider the equitable elements based on the Utah statute's discrimination against interstate commerce. *See Derma Pen, LLC v. 4EverYoung Ltd.*, 773 F.3d 1117, 1121 (10th Cir. 2014) (reversing and remanding for reconsideration of the equitable factors for a preliminary injunction because of the district court's erroneous assessment of likelihood of success); *see also eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 394 (2006) (vacating and remanding for the district court to apply its equitable discretion).

## IV.    Conclusion

I believe that the district court committed reversible error in its determination regarding likelihood of success. Thus, I would reverse and remand for the district court to (1) apply strict scrutiny and (2) reconsider the remaining preliminary injunction factors of irreparable injury, balancing of the equities, and the public interest.

18